WAYNE R. GROSS, State Bar No. 138828
*WGross@GGTrialLaw.com*
EVAN C. BORGES, State Bar No. 128706
*EBorges@GGTrialLaw.com*
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, CA 92626
Telephone: (949) 383-2800
Facsimile: (949) 383-2801

Attorneys for Defendant The Shady Canyon Golf Club, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

*ex rel.* RELATOR LLC, a California limited liability company,

Relator,

v.

STEVEN SUNSHINE, an individual; JON CHRISTY, an individual; and THE SHADY CANYON GOLF CLUB, INC., a California non-profit corporation; and DOES 1-10, inclusive,

Defendants.

Case No. 8:23-cv-00134-JVS-ADSx

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT THE SHADY CANYON GOLF CLUB, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

*Filed concurrently with Notice of Motion and Motion, Declaration of Evan C. Borges, Request for Judicial Notice, and [Proposed] Order*

Date: October 27, 2025
Time: 1:30 p.m.
Place: Ronald Reagan Federal Building and U.S. Courthouse
411 West Fourth Street
Courtroom 10C
Santa Ana, CA 92701
Judge: Hon. James V. Selna

Action Filed: January 23, 2023
Trial Date: Not Set

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 6

II. THE ORIGINAL COMPLAINT; THIS COURT'S ORDER DISMISSING THE ORIGINAL COMPLAINT; AND THE FAC. ........ 7

III. LEGAL STANDARD ........ 16

IV. ARGUMENT ........ 18

A. As with the Complaint, the FAC Must Be Dismissed Pursuant to the Statutory Public Disclosure Bar of the FCA. ........ 18

1. The First Two Requirements of the Public Disclosure Bar Are Satisfied. ........ 19

2. The Third Requirement of the Public Disclosure Bar is Also Satisfied. ........ 21

3. Dismissal of the FAC is Also Supported by the District Court Decision in *U.S. ex rel. Relator LLC v. Kellog*. ........ 22

4. Relator LLC is not an "Original Source" of the Public Disclosure. ........ 23

B. The FAC Also Should Be Dismissed Under Federal Rule 9(b), Because the FAC's Allegations are Conclusory, Speculative, and Do Not Allege Fraud with the Requisite Particularity. ........ 25

1. Relator LLC Fails to Allege With Particularity That Shady Canyon Misrepresented Its Eligibility for its PPP Loan. ........ 26

2. Relator LLC Fails to Allege With Particularity That Shady Canyon Provided a False and Fraudulent Good Faith Certification of Economic Necessity for Its PPP Loan. ........ 26

3. Relator LLC Fails to Allege With Particularity That Shady Canyon Made Other False Statements or Certifications. ........ 27

C. The FAC Fails To Plausibly Allege Scienter. ........ 27

D. The FAC Fails to State a Claim Against Sunshine and Christy. ........ 28

E. The Two New Purported Causes of Action in the FAC Do Not State a Claim as a Matter of Law ........ 29

V. CONCLUSION ........ 29

L.R. 11-6.2. Certificate of Compliance ........ 30

EXHIBIT 1 ........ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex. rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667 (9th Cir. 2018) ..... 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..... *passim*

*Bell Atl. Corp v. Twombly*, 550 U.S. 544 (2007) ..... 15, 17

*Campbell v. Redding Med. Ctr.*, 421 F.3d 817 (9th Cir. 2005) ..... 18

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ..... 13

*United States ex rel. Integra Med Analytics LLC v. Providence Health and Servs.*, 2019 WL 3282619 (C.D. Cal. July 16, 2019), *rev'd and remanded on other grounds* 854 F. App'x 840 (9th Cir. 2021) ..... 21

*United States ex rel. Jones v. Sutter Health*, 2021 WL 3665939 (N.D. Cal. Aug. 18, 2021) ..... 28

*Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923 (N.D. Cal. 2019) ..... 17

*United States ex. rel. Mateski v. Raytheon Co.*, 816 F.3d 565 (9th Cir. 2016) ..... 18, 21

*United States ex. rel. Modglin v. DJO Global Inc.*, 114 F.Supp.3d 993 (C.D. Cal. 2015) ..... 28

*United States ex rel. Relator LLC v. Baxter*, No. 23-cv-00336-WHO, 2025 WL 1343076 (N.D. Cal. May 8, 2025) ..... 16

*U.S. ex rel. Relator LLC v. Erskine*, 2025 U.S. Dist. LEXIS 46469 (S.D. Cal. Feb. 25, 2025) ..... 25

*United States ex rel. Relator LLC v. Kellog*,
2025 WL 897439 (S.D. Cal. Mar. 24, 2025)....22, 23

*United States ex rel. Rose v. Stephens Inst.*,
909 F.3d 1012 (9th Cir. 2018)....26

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013)....17

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)....27

*United States ex rel. Solis v. Millennium Pharmaceuticals, Inc.*,
885 F.3d 623 (9th Cir. 2018)....19

*United States ex rel. Solis v. Millennium Pharms., Inc.*,
445 F. Supp. 3d 786 (E.D. Cal. 2020), *aff'd sub nom. Solis v. Millennium Pharms., Inc.*, 852 F. App'x 298 (9th Cir. 2021)....24

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
14 F. 3d 645 (D.C. Cir. 1994)....21

Swoben v. UnitedHealthcare Ins. Co., 848 F.3d 1161 (9th. Cir. 2016)....28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....17

*United States v. Allergan, Inc.*,
46 F. 4th 991 (9th Cir. 2022)....19

*United States v. Corinthian Coll.*,
655 F.3d 984 (9th Cir. 2011)....17, 28

*United States v. Villaspring Health Care Ctr., Inc.*,
2011 WL 6337455 (E.D. Ky. Dec. 19, 2011)....28

**Statutes**

15 U.S.C. § 636....11

31 U.S.C. § 3729....17, 27

31 U.S.C. § 3730....18, 24

Coronavirus Aid, Relief, and Economic Security Act Division A, Title I (CARES Act) ........ 8, 11, 12

False Claims Act ........ *passim*

Paycheck Protection Program as Amended by Economic Aid Act ........ 11

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ........ 16, 17, 18

Fed. R. Civ. Proc. 9(b) ........ *passim*

J. Boese & D. Baruch, *Civil False Claims and Qui Tam Actions*, § 2.12 (5th ed. 2021) ........ 29

Defendant The Shady Canyon Golf Club, Inc. ("**Shady Canyon**") submits this memorandum in support of its motion to dismiss (the "**Motion**") the first amended complaint filed by plaintiff Relator LLC ("**Relator LLC**") on July 30, 2025 [Dkt. No. 46] (the "**FAC**").

## I. INTRODUCTION

Relator LLC filed the FAC after this Court, by Order dated June 30, 2025 [Dkt. No. 43] (the "**Order**"), granted Shady Canyon's motion to dismiss Relator LLC's original Complaint (the "**Complaint**") (with 30 days leave to amend), based upon application of the public disclosure bar of the False Claims Act ("**FCA**").

The FAC does not contain new material allegations of fact as compared to the Complaint. Rather, upon scrutiny, the FAC reveals itself as a restatement of the same conclusory allegations in the Complaint. Thus, for the same reasons that the Court dismissed the Complaint based upon the FCA's statutory public disclosure bar, the FAC should be dismissed. In addition, the FAC should be dismissed for failing to allege with specificity a false claim under the FCA, as required by Federal Rule 9(b).

While the FAC does not add material allegations of fact, it adds two new causes of action: (1) an additional cause of action under the FCA, which is premised on the same alleged "fraud" as the FCA claim that the Court already dismissed; and (2) a common law cause of action for unjust enrichment.

First, the additional FCA cause of action should be dismissed for the same reasons the Court dismissed the Complaint, i.e., the public disclosure bar applies. Further, the FAC does not plead a fraud claim under the FCA with specificity, as required by Rule 9(b).

Second, the new common law claim for unjust enrichment must be dismissed given that, as a matter of law, a *qui tam* relator such as Relator LLC does not have standing to bring common law claims for unjust enrichment or otherwise.

In sum, as elaborated below, the FAC should be dismissed because:

(1) The FAC is barred by the statutory public disclosure bar of the FCA.

(2) The FAC does not meet the pleading requirements of Federal Rule 9(b), and does not plead facts plausibly allowing for a finding of scienter.

(3) The FAC does not plead facts under Rule 9(b) to support the serious accusations of fraud against the federal government asserted against individual defendants Steven Sunshine and Jon Christy.

(4) A *qui tam* relator such as Relator LLC does not have legal standing to bring and cannot bring the newly-asserted claim for unjust enrichment.

Relator LLC has been given an opportunity to amend but still does not state a claim as a matter of law. No conceivable amendment could avoid application of the public disclosure bar; and no amendment will change Relator LLC's lack of legal standing to allege a cause of action for unjust enrichment. Shady Canyon requests that the Court dismiss the FAC without leave to amend.

## II. THE ORIGINAL COMPLAINT; THIS COURT'S ORDER DISMISSING THE ORIGINAL COMPLAINT; AND THE FAC.

### A. The Original Complaint and this Court's Order of Dismissal.

As noted in the Court's Order, the gravamen of the Complaint was as follows:

- In late March/early April 2020, Shady Canyon applied for and obtained a Paycheck Protection Program ("**PPP**") loan of $1.689 million, which was approved on April 3, 2020.
- Under the rules allegedly in effect at the time of Shady Canyon's application, private clubs that restricted membership for reasons other than capacity were **not** eligible for PPP loans.
- Shady Canyon was a private, exclusive, members-only club that restricted membership for reasons other than capacity.
- Accordingly, when Shady Canyon in its PPP loan application certified that it was "eligible" for a PPP loan under the then-applicable rules (the "**Eligibility Certification**"), the Eligibility Certification was allegedly false.

The full Eligibility Certification provided as follows: "[t]he Applicant is eligible to receive a loan [1] **under the rules in effect** at the time this application is submitted [2] **that have been issued by the Small Business Administration (SBA)**

***implementing the Paycheck Protection Program*** under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (Cares Act) (the Paycheck Protection Program Rule)." *See* Ex. 1 to FAC at p. 3 of 5 (emphasis added).

As discussed below, it was not until April 15, 2020 (that is, ***after*** Shady Canyon submitted its PPP loan application and ***after*** its PPP loan was approved on April 3, 2020), that the first interim rule issued by the SBA "implementing the PPP program" – which excluded from eligibility certain private clubs – became effective. Thus, Shady Canyon's Eligibility Certification was truthful based on the rules in effect at the time it was made.

Regardless, as this Court found in its Order, prior to Relator LLC filing its Complaint, "public disclosures" (as defined in the FCA) had been made in official government websites and news media of the following elements of the "fraud" alleged in the Complaint: (1) Shady Canyon certified its eligibility for and obtained a PPP loan of $1.689 million, notwithstanding the fact that (2) Shady Canyon was a private club that restricted membership for reasons other than capacity. Regarding the latter public disclosure, the Court granted Shady Canyon's request for judicial notice of a 2021 press article from the Irvine Standard news (i.e., prior to Relator LLC coming into existence in 2022), which publicly disclosed that:

> **A major local draw is the Shady Canyon Golf Club [with a] 300-acre course,** designed by the celebrated architect Tom Fazio . . . . **The private club**, which includes a 43,000-square-foot clubhouse, tennis courts and a 6,700-foot wellness center, **is by invitation only, and you have to be sponsored. Initiation fees reportedly run more than $100,000, on top of the monthly fees**.

*See* Request for Judicial Notice [Dkt. No. 37-02] and Ex. E to Declaration of Evan C. Borges in Support of Motion to Dismiss [Dkt. No. 37-08] (emphasis added).

Based upon (i) the allegations of the Complaint, (ii) public disclosure on an official government website of various details of the PPP loan to Shady Canyon

(including identity of applicant, number of employees, date of approval, amount of loan, and date of forgiveness of loan), and (iii) the above-referenced public disclosure of the fact that Shady Canyon was a private club that restricted membership for reasons other than capacity, the Court in its Order ruled that under the FCA's public disclosure bar – "**substantially the same allegations or transactions alleged in the action or claim were publicly disclosed** [before the filing of the Complaint]." Thus, the Court followed the statutory mandate that the action "shall" be dismissed unless Relator LLC were to establish that it was an "original source," which Relator LLC did not do.

**B. <u>Relator LLC's Opposition to the Motion to Dismiss the Complaint, Based Upon Other Alleged "False" Certifications.</u>**

In addition to the core alleged false Eligibility Certification, the Complaint alleged additional "false" certifications by Shady Canyon in connection with its PPP loan, which Relator LLC emphasized in its Opposition to Shady Canyon's prior motion to dismiss. These other alleged "false" certifications, however, were dependent upon, derivative of, and/or intertwined with the allegations related to Shady Canyon's Eligibility Certification, and therefore, were also barred by the public disclosure rule. Further, Relator LLC did not plead these other alleged false certifications with the specificity required by Federal Rule 9(b).

**1. <u>Alleged False Use of Proceeds Certification</u>.**

The Complaint alleged that Shady Canyon's PPP loan application included a "false" Use of Proceeds Certification. First, the Complaint quoted the following language from a PPP loan application form, which required a certification that the loan proceeds would be used for enumerated business-related purposes: "the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures." Complaint, ¶ 30; *see also* ¶¶ 33, 35.

Next, relying on the core allegation that Shady Canyon, as a private club that restricted membership for reasons other than capacity, was purportedly ineligible for a PPP loan, the Complaint alleged:

> The proceeds of the PPP Loans (sic) were not and could not have been used only for business-related purposes consistent with the Paycheck Protection Program Rule, because, among other things, [Shady Canyon] was not an eligible business, therefore when Defendants made the Use of Proceeds Certification, the certification was false.

Complaint, ¶ 48.

As pleaded, therefore, the Complaint's allegation of a false Use of Proceeds Certification was dependent upon and derivative of the core allegation that Shady Canyon – as a private club that restricted membership for reasons other than capacity – was allegedly not eligible for a PPP loan under the rules in effect at the time of its application.

**2. Alleged False Loan Forgiveness Certification.**

The Complaint did not, in fact, contain an allegation about a false Loan Forgiveness Certification by Shady Canyon.[1] Nonetheless, in its Opposition to Shady Canyon's motion to dismiss the Complaint, Relator LLC argued:

> [Shady Canyon] applied for and received forgiveness for the full amount of the PPP Loan (plus accrued interest). . . .
>
> This forgiveness was also obtained through a false certification. Specifically, Defendants certified that the full loan amount had been used for authorized purposes, such as payroll, rent, or utilities, **but no**

[1] *See* Complaint, ¶¶ 2-17 (Introduction section summarizing Complaint; no mention of false loan forgiveness certification); ¶ 45 (listing alleged false certifications by Shady Canyon; no mention of false loan forgiveness certification); and ¶¶ 47-49 (allegations regarding "false" certifications of eligibility, use of proceeds, and economic necessity; no mention of false loan forgiveness certification).

**purpose could have been authorized because [Shady Canyon] was ineligible to receive the funds in the first place**.

Opposition [Dkt. No. 38] at 9:4-7 (emphasis added).

Once again, as with the allegations of a false Use of Proceeds Certification, Relator LLC described its allegations about a false loan forgiveness certification as wholly dependent upon the core allegation that Shady Canyon – as a private club that restricted membership for reasons other than capacity – was ineligible for a PPP loan.

**3. Alleged False Economic Necessity Certification**.

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**"). The CARES Act put in place the PPP loan program, and required that PPP loan applicants "make a good faith certification . . . that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient." 15 U.S.C. § 636(a)(36)(G)(i) (the "**Economic Necessity Certification**").

Shady Canyon's PPP loan application was approved on April 3, 2020. Complaint, ¶22; FAC, ¶ 19. Thus, it is uncontroverted that Shady Canyon applied for a PPP loan very shortly after the mid-March 2020 governmental shutdown directives, stay-at-home orders, and related public health authority declarations of a global pandemic and public health emergency due to COVID-19, which was unprecedented in recent history.

As Shady Canyon noted in its motion to dismiss the Complaint, in May 2020, the SBA, which was charged with implementing PPP loans, issued further guidance on the required economic necessity certification by creating "a **safe harbor** providing that any PPP borrower, together with its affiliates, that received PPP loans with an original principal amount of **less than $2 million** will be **deemed** to have made the required certification concerning the necessity of the loan request in **good faith**." Business Loan Program Temporary Changes; Paycheck Protection Program

as Amended by Economic Aid Act, 86 Fed. Reg. 3692, 3706 (Jan. 14, 2021) (to be codified at 13 C.F.R. pts. 113, 120, 121) (emphasis added). Accordingly, Shady Canyon, due to its PPP loan amount of $1.689 million, fell within the safe harbor announced by the SBA.

Notwithstanding – (1) the circumstances at the time Shady Canyon submitted its PPP loan application in late March/early April 2020 (i.e., less than two weeks after governmental mandates of shutdowns, stay-at-home orders, and declarations by public health authorities of a global pandemic and public health emergency due to COVID-19), and (2) the fact that Shady Canyon's PPP loan fell squarely within the SBA's safe harbor announced in May 2020 – the original Complaint alleged that Shady Canyon's Economic Necessity Certification was knowingly false and fraudulent when it was made because:

> They did not need the money. ***On information and belief***, membership dues were not diminished as a result of COVID-19. ***On information and belief***, Defendants have access to ready funds because membership dues were fully paid with minimal or no delinquencies at the time Defendants applied for and received the Loan and when they applied for and received forgiveness of the Loan.[2] Therefore, when Defendants made the Economic Necessity Certification[,] the certification was false.

Complaint, ¶ 9 (emphasis added). Later, the Complaint repeated the above allegations, and added: "There is every indication that Defendants' business

---

[2] Contrary to the implication of the Complaint, under the PPP program, the only certification of economic necessity that a PPP loan applicant or borrower was required to provide was with the initial PPP loan application. Nowhere does Relator LLC cite to any rule or requirement of a certification of economic necessity that a PPP loan applicant or borrower must provide other than at the time of the initial loan application.

continued to thrive and have positive revenue. . . There is no evidence of any business loss. Business was good." Complaint, ¶ 49.

The above-quoted allegations – which are restated with no substantive difference in the FAC – amount to conclusory, inherently vague speculation about Shady Canyon's financial condition at the time it applied for a PPP loan; they allow at best for an inference of "the mere possibility of misconduct," which is **not** sufficient under *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); and they do not meet the specificity requirements of Rule 9(b). *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (the court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" (internal quotation marks omitted)).

As a substitute for actual factual allegations about the specific financial condition of Shady Canyon at the time of its PPP loan application, Relator LLC repeatedly – in its Complaint, Opposition to Shady Canyon's motion to dismiss, and newly-filed FAC – uses conclusory, vague, subjective, and speculative labels to describe the financial condition of **all** members of Shady Canyon as uniformly "the financial elite," "wealthy people," and "the ultra-rich."[3]

From a starting point of conclusory, speculative, and vague allegations in the form of labels about ***all*** members of Shady Canyon across the board, Relator LLC takes ***another*** leap of speculation, with no supporting factual allegations, to

[3] *See* Complaint, ¶¶ 2, 5, 8 (describing defendants as or comparable to - "***the ultra rich,***" "***wealthy people***," the "***financial elite***,"and the "***sophisticated, elite members*** of [Shady Canyon]"). *See also* Opposition [Dkt. No. 38] at 7:24-25 ("The Country Club's **members come from the *sophisticated and elite of Irvine* and the surrounding area** [.]") and at 12-13 ("Indeed, **on information and belief, the Club's *wealthy clientele* continued to pay their member dues and the Country Club** (as other similar country clubs ) **maintained profitability during the pandemic**.") (emphasis added). *See also* FAC, ¶¶ 4, 5, 56 (Shady Canyon members "***affluent***," "***wealthy membership*** . . . with more time to enjoy . . . their private country club," and "***wealthy members***").

conclude that: as of late March/early April 2020, when Shady Canyon applied for its PPP loan, the financial condition of Shady Canyon itself (which had approximately 160 employees at the time) was (1) already profitable based upon past income and expenses, with more than adequate liquidity to pay all foreseeable business expenses including all payroll, and (2) going forward, irrespective of the future course of the pandemic, its impact on the global, national, and local economies, or its impact on Shady Canyon, its employees, its members or their families, the future financial condition of Shady Canyon could be forecast with sufficient certainty that it would continue unabated without any adverse impact on operations or ability to make payroll – such that Shady Canyon's "good faith" Economic Necessity Certification was knowingly false and fraudulent.

**C. <u>The FAC</u>.**

The FAC does not add any material allegations of fact as compared to the Complaint.

In identical manner as the Complaint, the FAC pleads as its core contentions of fraud and false certification that: (1) Shady Canyon, in its application for a PPP loan in late March/early April 2020, certified it was eligible for a PPP loan under then-applicable rules; and (2) Shady Canyon, in fact, was ineligible for a PPP loan because it was a private club that restricted membership for reasons other than capacity. *See* FAC, ¶¶ 3, 6, 7, 40, 54-57.

The FAC also alleges that Shady Canyon falsely certified in its PPP loan application that the loan proceeds will be used for enumerated and required business purposes. FAC, ¶¶ 42-43, 60-61. All the FAC alleges, however – with zero supporting factual assertions to explain what occurred and/or what the loan proceeds were used for – is the bald conclusion that Shady Canyon did ***<u>not</u>*** use its PPP loan proceeds for the required, enumerated business purposes. *Id.*, ¶¶ 43, 61. Relator LLC provides no factual allegations on any alleged uses of loan proceeds for any purpose not permitted by the PPP loan program. Relator LLC's conclusory

allegations without pleading *any* factual basis are insufficient under *Twombly*, *Iqbal*, and the particularity requirements of Rule 9(b).

The FAC also alleges a "false" certification by Shady Canyon in a PPP loan forgiveness application. All the FAC does, however, is describe what must be certified in a loan forgiveness application under the PPP regarding uses of the loan proceeds. FAC, ¶¶ 34-36, 46-47. After providing a list of the PPP loan forgiveness requirements, the FAC asserts another bald conclusion, not supported by a single fact, that Shady Canyon did ***not*** use its PPP loan proceeds for the purposes described in its loan forgiveness application and certification. *Id.*, ¶ 48. These conclusory assertions, supported by no facts, are insufficient under *Twombly*, *Iqbal*, and the particularity requirements of Rule 9(b).

Finally, in the FAC, Relator LLC merely rewords its conclusory allegations in the Complaint about Shady Canyon's alleged false economic necessity certification. FAC, ¶¶ 2, 4, 41, 59, 68. The FAC does not plead any specific facts about Shady Canyon's actual financial condition at the time it made its economic necessity certification for its initial PPP loan application in late March/early April 2020. Instead, the FAC uses conclusory terms such as that Shady Canyon's revenue was somehow "guaranteed," allegedly due to the club's equally undefined "affluent" members. *Id.*, ¶¶ 2, 4.

The FAC also incorrectly implies that the economic necessity certification, in addition to being made at the time of Shady Canyon's initial PPP loan application in late March/early April 2020, was allegedly required to be provided again at later points in time. *Id.*, ¶¶ 2, 4. No such requirement exists.

The "false" economic necessity certification contentions in the FAC amount to conclusory and speculative allegations about Shady Canyon's financial condition at the time of its late March/early April 2020 PPP loan application. Such allegations do not comply with Rule 9(b).

It defies credulity that Relator LLC, in the context of – (1) the extraordinary

circumstances faced by Shady Canyon and virtually any other business or person in late March 2020, (2) the relevant time period being the time of Shady Canyon's PPP loan application in late March/early April 2020, (3) a PPP rule requiring a "good faith" certification of economic necessity, and (4) the undisputed fact that Shady Canyon, due to the less than $2 million amount of its PPP loan, fell squarely within an SBA safe harbor announced in May 2020 such that it was **deemed** to have provided its certification in good faith – persists in the FAC to make the conclusory allegation that Shady Canyon's certification was false and fraudulent, without a single material fact alleged about Shady Canyon's financial condition at the time.

Based upon Rule 9(b), in *United States ex rel. Relator LLC v. Baxter*, No. 23-cv-00336-WHO, 2025 WL 1343076 (N.D. Cal. May 8, 2025), the District Court dismissed with prejudice another FCA action brought by Relator LLC against a PPP loan borrower. In *Baxter*, as here, Relator LLC contended that that defendants had made a false economic necessity certification, alleging: "[w]hen they applied, Defendants knew the loan was not necessary, including to support their ongoing operation of the clubs and amenities available to them, whose **members who directly benefited from them were certainly able to support them if needed**." *Id*., 2025 WL 1343076 at *9 (emphasis added).

The Court in *Baxter* rejected Relator LLC's conclusory allegations – virtually identical to Relator LLC's allegations in this case of a false economic necessity certification by Shady Canyon – and observed that "Relator does not precede or follow [its] conclusory allegations with any ***particular*** facts that are sufficient to the meet the requirements pursuant to Rule 9(b)." *Id*. at *10 (emphasis in original). This Court should reach the same conclusion and dismiss the FAC with prejudice.

## III. <u>LEGAL STANDARD</u>

To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* A plaintiff must provide more than mere legal conclusions. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Relator LLC's allegations that Shady Canyon made false statements in violation of the FCA are subject to the heightened pleading requirements of Federal Rule 9(b). *United States v. Corinthian Coll.*, 655 F.3d 984, 992 (9th Cir. 2011). Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, a "complaint must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citing *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).

In addition, a relator under the FCA must allege facts plausibly demonstrating that the defendant *knowingly* committed one or more of the statutorily-enumerated violations. *See* 31 U.S.C. § 3729(a)(1)(A)-(a)(1)(G).

In ruling on a Rule 12(b)(6) motion, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference and matters of which the court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court is not bound to accept as true legal conclusions couched as a factual allegation, *Twombly*, 550 U.S. at 555, nor is it bound to "accept as true allegations contradicted by judicially noticeable facts." *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 937 (N.D. Cal. 2019). "[The court] may look beyond plaintiff's complaint to matters of

public record without converting the Rule 12(b)(6) motion into a motion for summary judgment[.]" *Id.* (internal citations omitted).

## IV. ARGUMENT

### A. As with the Complaint, the FAC Must Be Dismissed Pursuant to the Statutory Public Disclosure Bar of the FCA.

The FCA's public disclosure bar provides as follows:

> **The court shall dismiss an action or claim under this section**, unless opposed by the Government, **if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed**—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> **unless** the action is brought by the Attorney General or **the person bringing the action is an original source of the information**.

31 U.S.C. § 3730(e)(4)(A) (emphasis added). The public disclosure bar furthers the FCA's intent "to encourage suits by whistle-blowers with genuinely valuable information, while discouraging litigation by plaintiffs who have *no significant information of their own to contribute*." *United States ex. rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016) (emphasis added). Congress enacted the bar to prevent "parasitic lawsuits" by "opportunistic plaintiffs with no significant information to contribute of their own." *Id.* (citing *Graham Cty. Soil & Water Conservation Dist. v. United States ex. rel. Wilson*, 559 U.S. 280, 294 (2010)); *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 820 (9th Cir. 2005) (The public disclosure bar seeks to prevent "opportunistic individuals from bringing qui tam actions—and sharing in the government's recovery—when they have done nothing to expose the allegations of fraud.").

The "public disclosure bar is triggered if three conditions are met: (1) the

disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was public; and (3) the relator's action is substantially the same as the allegation or transaction publicly disclosed." *United States ex rel. Solis v. Millennium Pharmaceuticals, Inc.*, 885 F.3d 623, 626 (9th Cir. 2018) (internal quotations omitted); *United States v. Allergan, Inc.*, 46 F. 4th 991, 994 (9th Cir. 2022) (same). All three conditions are present here.

**1. The First Two Requirements of the Public Disclosure Bar Are Satisfied.**

In this case, the public disclosures of the facts and transactions alleged in the FAC occurred through one of the channels specified in the statute, and the disclosures were public.

The FAC alleges that on April 3, 2020, Shady Canyon was approved for and received a PPP loan in the amount of $1,689,200. FAC, ¶ 19. This transaction and the facts alleged in the FAC are publicly available on a page titled "PPP Borrower Search" on an "official website of the United States government," PandemicOversight.gov, which has a ".gov" web address (the "**Website**"). Borges Decl., ¶ 2, Ex. A.

As this Court found in its Order, the Website qualifies as a "report" under the public disclosure bar. Order at 6-7 (citing *United States ex rel. Relator LLC v. Kellog*, 2025 WL 897439, at *3 (S.D. Cal. Mar. 24, 2025); *United States ex rel. Relator, LLC v. Koostra*, 2024 WL 3666470, at *3 (E.D. Cal. Aug. 6, 2024)).

Searching for "Shady Canyon Golf Club" on the Website returns results showing that on April 3, 2020, Shady Canyon was approved for one PPP loan in the amount of $1,689,200; and that Shady Canyon is in the "Arts, Entertainment, and Recreation" industry. *Id.* The Website also discloses other information about the PPP loan to Shady Canyon: the full name of the business that received the loan; the loan amount; the date the loan was approved; the lender; the loan amount forgiven; the date the loan amount was forgiven; the number of jobs reported, the number of

loans; the spending category; and the industry. Borges Decl., ¶ 2, Ex. A.

In addition, information contained in the FAC is publicly available in news media sources, including a news website called ProPublica.Org, which also maintains a database of PPP loan recipients. Borges Decl., ¶ 5, Ex. D (excerpt from ProPublica website). The Court in its Order found that the ProPublica online source constitutes "news media" under the FCA public disclosure bar. Order at 7.

For more than 20 years, the following facts about Shady Canyon have been publicly disclosed in "news media" as defined in the FCA public disclosure bar: (1) Shady Canyon has been and is a private, exclusive, members-only club with expensive membership fees and other restrictions on membership unrelated to capacity; (2) Shady Canyon's 300-acre golf course is the centerpiece of an expensive gated community; and (3) Shady Canyon's members have been repeatedly described with adjectives such as wealthy or affluent.

In support of its motion to dismiss the Complaint, Shady Canyon attached the Irvine Standard news article quoted above, which discloses that Shady Canyon was and is a private, exclusive, members-only club that restricts membership for reasons other than capacity, including based on charging expensive membership fees. This Court in its Order made a finding that "the Irvine Standard article constitutes 'news media' because it is of interest to the public and could be found in a newspaper, broadcast, or other news source." Order at 7-8.

With this Motion, to eliminate any doubt on the breadth of news media publicly disclosing the same facts set forth in the Irvine Standard article as well as additional facts, Shady Canyon requests that the Court take judicial notice of additional news media articles (attached to the Borges Declaration filed with this Motion) from various sources, including the Los Angeles Times and Orange County Register, which span the approximately 23 year period since Shady Canyon opened in 2002. Shady Canyon submits that the news media articles of which it requests the Court take judicial notice, in particular the "mainstream" press articles from the Los

Angeles Times and Orange County Register, fall within the definition of news media in *United States ex rel. Integra Med Analytics LLC v. Providence Health and Servs*., 2019 WL 3282619, at *9-10 (C.D. Cal. July 16, 2019), *rev'd and remanded on other grounds* 854 F. App'x 840 (9th Cir. 2021), cited at page 7 of the Order.

A summary quoting excerpts from the news media that is the subject of Shady Canyon's request for judicial notice is attached hereto as **Exhibit 1**.

**2. The Third Requirement of the Public Disclosure Bar is Also Satisfied.**

In the Order, the Court describes this requirement as follows: "**The public disclosure bar only precludes claims where the allegations satisfying the elements of fraud are 'substantially the same' as what was disclosed through the statutory channels**. *See United States ex rel. Mateski v. Raytheon Co*., 816 F. 3d 565, 571 (9th Cir. 2016)). The commonly used *Springfield* test provides a simple formula to determine whether this criteria is satisfied:

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. **In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z**, i.e., the conclusion that fraud has been committed.

*Id.* (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F. 3d 645, 653-54 (D.C. Cir. 1994)). The "X" and the "Y" need not come from the same source. [citations omitted]." Order at 8 (emphasis added).

Applying the above formula, the Court in its Order observed that "PandemicOversight.gov provides only the "X": that Shady Canyon received PPP loans in the amount of $1,689,200." *Id*. The Court continued: "Neither PandemicOversight.gov nor Propublica are able to provide the "Y" (that Shady Canyon was ineligible as a private club that restricted membership for reasons other than capacity)." *Id*.

After referring to "the critical element that Shady Canyon is, itself, a private club," the Court concluded its public disclosure ruling as follows:

> **Thus, for Relator's claim to be barred, there must be another source of statutorily approved public information to show that Shady Canyon is a private club.**
>
> **The Irvine Standard article fills this gap. In this article, Shady Canyon is described as a "private club," that accepts members "by invitation only."** Taken together with ProPublica and PandemicOversight.gov, **it was a matter of public knowledge that Shady Canyon received PPP loans despite being ineligible as a private club that restricts members based on facts other than capacity. The Complaint alleges precisely these allegations**. Thus, by Relator's allegations, the prohibited conduct was publicly available prior to the filing of the Complaint.

Order at 9 [internal citations omitted] (emphasis added).

The FAC changes nothing about the Court's above analysis.

In addition, to the extent Relator LLC's inherently vague, subjective, speculative and uniform labels for Shady Canyon's members as "wealthy" or "affluent" allow for an *additional* speculative inference about the financial condition of Shady Canyon itself at the time of its PPP loan application in late March/early April 2020, then the other news media of which Shady Canyon requests the Court take judicial notice, gives public disclosure of generalized use of such labels of "wealth" for more than 20 years. Thus, the Government has been on notice for a long time of whether Shady Canyon, an ostensibly "exclusive" private club for the "wealthy," should be investigated regarding its good faith certification of economic necessity for its PPP loan.

**3. Dismissal of the FAC is Also Supported by the District Court Decision in *U.S. ex rel. Relator LLC v. Kellog*.**

The decision of the District Court in *Kellog*, *supra*, is instructive regarding application of the public disclosure bar in this case. In *Kellog*, as here, Relator LLC

alleged that the private club defendant, in fact, was not eligible for a PPP loan on the ground that the club was private, for members only, and expensive; and that therefore, one can infer the club restricted membership for reasons other than capacity. *Kellog*, 2025 WL 897439, at *1. As with Shady Canyon, the facts and transactions regarding the club defendant in *Kellog* (the La Jolla Beach and Tennis Club), including that it was a private club, for members only, with expensive dues, were publicly disclosed in the Website and news media sources. *Id.* at *3-*4. Thus, the Court in *Kellog* reasoned that the public disclosures were "substantially similar" to Relator LLC's allegations because the publicly disclosed "X" (the fact that the defendant club obtained a PPP loan) and "Y" (the guidelines regarding prohibition on certain clubs receiving PPP loans, along with the fact that the defendant club was private, exclusive and expensive, which allowed for an inference of restricting membership for reasons other than capacity) together permitted an inference of "Z" that potential fraud had been committed. *Id.* at *4. *Kellog* is on all fours with this case.

Also, in *Kellog*, as here, Relator LLC had filed an amended complaint with the same "additional" allegations that Relator LLC claims to have added to the FAC. Specifically, Relator LLC filed an amended complaint that, in addition to discussing the club defendant's certification of eligibility for a PPP loan, alleged false certifications relating to (i) "economic necessity" for the PPP loan, and (ii) as part of obtaining forgiveness of the PPP loan, a "use of funds" certification attesting to use of the PPP loan for payroll and other business expenses. Nonetheless, the District Court granted the club defendant's motion to dismiss the amended complaint without leave to amend. This Court should so rule on this Motion.

**4. Relator LLC is not an "Original Source" of the Public Disclosure.**

Once, as here, the public disclosure bar applies, "[t]he court shall dismiss [the] action . . . unless . . . the person bringing the action is an original source of the

information." 31 U.S.C. § 3730(e)(4)(A).

The relator "bears the burden of establishing that [it] qualifies as an original source." *United States ex rel. Solis v. Millennium Pharms., Inc.*, 445 F. Supp. 3d 786, 795 (E.D. Cal. 2020), *aff'd sub nom. Solis v. Millennium Pharms., Inc.*, 852 F. App'x 298 (9th Cir. 2021).

An "original source" must be an individual "who either (1) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an [FCA] action." 31 U.S.C. § 3730(e)(4)(B).

Prong (1) above applies only if, "**prior to** a public disclosure," an individual voluntarily discloses the information at issue to the Government. Prong (1) cannot apply to the present case because Relator LLC did not even come into existence until 2022, **after** the above-described news media public disclosures of Shady Canyon being a private club that restricts membership for reasons other than capacity.

Relator LLC only has the potential of being an original source under prong (2) above. In this regard, the FAC contains only conclusory allegations about Relator LLC's alleged status as an original source, and alleges:

> 75. All facts alleged herein were discovered in the first instance by the Relator, who disclosed them to the Government prior to filing this *qui tam* action under seal.
>
> 76. To the extent there has been a public disclosure unknown to Relator, Relator is an original source under 31 U.S.C. § 3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations in this Complaint are based and voluntarily provided the information to the Government before filing a qui tam action based on the information. The allegations and causes of action set forth herein would not have come to light had it not been for Relator's knowledge.

FAC, ¶¶ 75-76.

Based on the fact of relevant public disclosures **prior to** the formation of Relator LLC in 2022, the allegation in paragraph 75 – i.e., that "all facts herein were discovered in the first instance by the Relator" – is demonstrably inaccurate. Next, paragraph 76 alleges in conclusory fashion the statutory elements for the prong (2) definition of an original source, without any supporting factual allegations.

The FAC's conclusory recitals of the elements of the statutory definition of an original source do not suffice, just as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In another FCA action brought by Relator LLC against a PPP loan recipient where, as here, Relator LLC alleged in conclusory fashion that it met the statutory definition of original source, the District Court held:

> **[Relator LLC's] recitation of the definition of an original source is not sufficient**. *See Twombly*, 550 U.S. at 545 ("[A] formulaic recitation of a cause of action's elements will not do.") **Nor does Relator show that it has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions**. See 31 U.S.C. § 3730(e)(4)(B). Therefore the original source exception does not apply here.

*U.S. ex rel. Relator LLC v. Erskine*, 2025 U.S. Dist. LEXIS 46469 * 14-15 (S.D. Cal. Feb. 25, 2025) (emphasis added).

For the same reasons noted by the Court in *Erskine*, the original source exception does not apply in this case. The FAC should be dismissed with prejudice.

### B. The FAC Also Should Be Dismissed Under Federal Rule 9(b), Because the FAC's Allegations are Conclusory, Speculative, and Do Not Allege Fraud with the Requisite Particularity.

The Court also should dismiss the FAC because it is does not plead with

particularity facts establishing the first element of an FCA claim—that there was "a false statement or fraudulent course of conduct." *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017 (9th Cir. 2018).

**1. Relator LLC Fails to Allege With Particularity That Shady Canyon Misrepresented Its Eligibility for its PPP Loan.**

As a threshold matter, Shady Canyon disputes the contention that the prohibition set forth in 13 C.F.R. § 120.110(i) applies to its PPP loan application at all. It is undisputed that Shady Canyon's PPP loan application was approved on April 3, 2020. FAC, ¶ 19. Although issued with immediate effect, the SBA regulation referring to the list of ineligible business types set forth in 13 C.F.R. § 120.110 was not issued until April 15, 2020. The FAC is devoid of any explanation why a loan application approved on April 3, 2020, can be fraudulent based on a regulation not in effect until April 15, 2020. Thus, the FAC fails to state a claim regarding a false eligibility certification.

**2. Relator LLC Fails to Allege With Particularity That Shady Canyon Provided a False and Fraudulent Good Faith Certification of Economic Necessity for Its PPP Loan.**

As discussed above, the context of Shady Canyon's PPP loan application was: (1) the extraordinary circumstances faced by Shady Canyon and virtually any other business or person in late March 2020, (2) the relevant time period being the time of Shady Canyon's PPP loan application in late March/early April 2020, (3) a PPP rule requiring a "good faith" certification of economic necessity, and (4) the undisputed fact that Shady Canyon, due to the less than $2 million amount of its PPP loan, fell squarely within an SBA safe harbor announced in May 2020 such that it was **deemed** to have provided its certification in good faith. Nonetheless, Relator LLC makes the incredulous, conclusory, and speculative allegation that Shady Canyon's certification was false and fraudulent, without a single material fact alleged about Shady Canyon's financial condition at the time.

**3. Relator LLC Fails to Allege With Particularity That Shady Canyon Made Other False Statements or Certifications.**

As noted above, the FAC alleges in conclusory fashion that Shady Canyon falsely certified that it use PPP loan proceeds for business-related purposes consistent with PPP rules. Relator LLC, however, fails to plead a single fact to support the contention that Shady Canyon used its PPP loan proceeds for any improper purpose. The FAC should be dismissed under Rule 9(b).

**C. <u>The FAC Fails To Plausibly Allege Scienter.</u>**

Relator LLC's failure to adequately plead that Shady Canyon "knowingly" violated the FCA furnishes another ground for dismissal of the FAC. Relator LLC must plausibly allege facts establishing that Shady Canyon acted (1) with actual knowledge, (2) "in deliberate ignorance of the truth or falsity of the information," or (3) "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(b)(1)(A)(iii). Merely alleging knowledge of the existence of regulatory requirements is insufficient; Relator LLC must allege knowledge **as to the false claim itself**. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 752 (2023) (focus of scienter is "what the defendant thought when submitting the false claim—not what the defendant may have thought after submitting it") (emphasis in original).

The FAC offers only conclusory allegations that "Defendants knowingly presented or caused to be presented . . . materially false or fraudulent claims for payment [;]" and "knowingly made, used, or caused to be made or used, one or more false records or statements material to a false or fraudulent claim[.]" FAC, ¶¶ 78, 84. The FAC surmises that Shady Canyon or an individual acting on its behalf acted with actual knowledge, deliberate ignorance, or reckless disregard, but alleges no facts that plausibly support any of these theories of scienter.

While "[t]he knowledge or scienter element of a fraud claim need not be pleaded with particularity . . . knowledge must still be pleaded sufficiently to make

entitlement to relief plausible." *United States ex. rel. Modglin v. DJO Global Inc.*, 114 F.Supp.3d 993, 1011-12 (C.D. Cal. 2015) (quoting *Owens v. Bank of America, N.A.*, No. 11–cv–4580–YGR, 2013 WL 1820769, *4 (N.D. Cal. Apr. 30, 2013)). "A complaint therefore must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." *United States ex. rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679-680 (9th Cir. 2018). The FAC makes no such allegations.

**D. <u>The FAC Fails to State a Claim Against Sunshine and Christy.</u>**

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Corinthian Colls.*, 655 F.3d at 997-98 (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007)). "A plaintiff must 'identify the role of each defendant in the alleged fraudulent scheme.'" *Swoben*, 848 F.3d at 1184 (quoting *Corinthian Colls.*, 655 F.3d at 997-98).

But for identifying individual defendants Mr. Sunshine and Mr. Cristy as having served as CEO and CFO of Shady Canyon, the FAC does not plead specific facts to meet the heightened 9(b) standard required to plead the serious claim of fraud against these individuals. *See United States ex rel. Jones v. Sutter Health*, 2021 WL 3665939, at *8 (N.D. Cal. Aug. 18, 2021) (relator failed to state claim against individual defendants where the complaint "barely mentions some defendants at all"); *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 6337455, at *9 (E.D. Ky. Dec. 19, 2011) (complaint failed to state claim against individual defendant where the complaint "barely mentions [defendant] by name"); *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Given that, after an opportunity to amend, the FAC does not allege any facts

with particularity to support the serious accusations of fraud against Mr. Sunshine and Mr. Christy, the FAC should be dismissed without leave to amend.

### E. The Two New Purported Causes of Action in the FAC Do Not State a Claim as a Matter of Law

After pleading no new material facts, the FAC adds two new causes of action: (1) an additional cause of action under the FCA, which is premised on the same alleged "fraud" as the FCA claim that the Court already dismissed; and (2) a common law cause of action for unjust enrichment.

The additional FCA cause of action should be dismissed (a) for the same reasons the Court dismissed the Complaint and the FAC should be dismissed, , i.e., the public disclosure bar applies, and (b) because the FAC does not plead a fraudulent claim with specificity under Rule 9(b).

The new common law claim for unjust enrichment must be dismissed given that, as a matter of law, a *qui tam* relator such as Relator LLC does not have standing to bring common law claims for unjust enrichment. *See* J. Boese & D. Baruch, *Civil False Claims and Qui Tam Actions*, § 2.12 at 2-523, n. 1760 (5th ed. 2021) ("[T]hese alternative common law causes of action are **not** available to *qui tam* relators, who are empowered to sue on behalf of the government **through the FCA only**.") (citing cases) (emphasis added).

## V. CONCLUSION

For the foregoing reasons, Shady Canyon requests that the Court grant this Motion to Dismiss without leave to amend.

DATED: September 10, 2025

GREENBERG GROSS LLP

By: [signature]

Wayne R. Gross
Evan C. Borges
Attorneys for Defendant The Shady Canyon Golf Club, Inc.

**L.R. 11-6.2. Certificate of Compliance**

The undersigned, counsel of record for the moving party, in accordance with L.R. 11-6.1, certifies that this brief contains 7,761 words.

DATED: September 10, 2025 GREENBERG GROSS LLP

By: Evan C Borges

Wayne R. Gross
Evan C. Borges
Attorneys for Defendant The Shady Canyon Golf Club, Inc.

**EXHIBIT 1**

**EXCERPTS OF PUBLIC DISCLOSURES IN NEWS MEDIA ARTICLES (EXHIBITS TO BORGES DECLARATION) THAT ARE THE SUBJECT OF SHADY CANYON'S CONCURRENTLY FILED REQUEST FOR JUDICIAL NOTICE**

1. ***Course Rich with luxury // Commentary: Only those with $200,000 will get to play O.C.'s best course, Shady Canyon, because it is private***. By John Reger, The Orange County Register, July 4, 2002.

- "The [Shady Canyon] course, which opened February, is a **private club** and its owners are determined that it will be **one of the most exclusive courses in not only the county, but also the country**." (emphasis added).
- "'This is one [golf club] that is totally different to cater to a different group of people,' Davis said. 'This is one segment of the population that we didn't have a facility to meet their unique requirements.'"
- "The club will be limited to 400 members. . . . **Former major-leaguer Mark McGwire** has bought two lots and will build a house on them. **He already has been accepted as a member.**"
- "**With membership at $210,000 -- $185,000 if someone buys a lot that ranges from $600,000 to $2 million – not many people are going to be able to join**."
- Under a graphic illustration, the caption states: "**Shady Canyon in Irvine is a shade too expensive for most, but the Irvine Co. has found a clientele that can pay for membership fees and land**."

2. ***The 67th Masters; Private Investigation; Some clubs still restrict membership, but Shady Canyon takes family approach***. By Lance Pugmire, Los Angeles Times, April 10, 2003.

- "**Shady Canyon Golf Club in Irvine has attracted Southern California's elite** since opening in January 2002."
- "**Retired baseball slugger Mark McGwire, sports-talk king Jim Rome and drag-racing legend Kenny Bernstein are among the members** with daily access to all of Shady Canyon's perks – the 6,700-square-foot fitness center . . ., the 43,000-square-foot Santa Barbara-themed clubhouse and the challenging 7,000-yard championship golf course designed by architect Tom Fazio."
- "**Initiation is $185,000 for those who own one of Shady Canyon's 400 homes . . . and monthly dues are $795**, all of which gets members a 'private club [that] embodies the ideals of an institution devoted to the highest standards of the game,' according to a club brochure."
- "Those standards . . . include strong attention to avoiding discriminatory membership policies . . . . We decided early on that we will not

discriminate against race, creed, color or sex," Leenhouts said. "It's about family here. . ."

- "Anyone who can afford initiation and dues can apply to a membership committee that will judge the applicant, special consideration given to golfing skills, business success and community involvement."

3. ***CHIP SHOTS // Snakes present summer hazard.*** By John Reger, Orange County Register, July 3, 2003.

- "**While membership is exclusive at Shady Canyon Golf Club** in Irvine, one thing that has bypassed the application process is wildlife."

4. ***Made in the Shade; City's newest village designed for people with 'quiet wealth.'*** By Laylan Connelly, Irvine World News, February 15, 2004.

- "Shady Canyon is becoming known as a place for people with 'quiet wealth,' for those who have the means to buy a home worth millions, but want to enjoy it without the glitzy attention, said Dan Nahabedian, vice president of residential marketing for the Irvine Co. said."

- "'Shady Canyon's time has not come yet. It's going to be a more exclusive area. It's just going to be in a category of its own.'"

- "[A newly-built community in Shady Canyon] overlooks the Shady Canyon Golf Club – another distinctive feature of the community. A membership at the club costs $200,000, not including the monthly fees."

5. ***Golf Courses Not Green Enough? Design has become more environmentally friendly, activists say, but they're still wary.*** By Daniel Yi, Los Angeles Times, April 11, 2005.

- "Other golf courses are radically reducing the amount of land given over to manicured turf. At the Shady Canyon Golf Club in Irvine, a 300 acre **private** course nestled in the San Joaquin Hills, only 80 acres are devoted to greens and fairways, which are irrigated with reclaimed water."

6. ***What's next, the 99 cent country club?*** By David Whiting, Orange County Register, May 13, 2011.

- "The original $300,000 initiation fee at Shady [Canyon] has been modified with what the club describes as a "float system." This allows members to sell their memberships for as little as $125,000."

7. ***Many U.S. country clubs modernizing for survival.*** By Kathleen Kingsbury, Lauren Young, and Jilian Mincer, Reuters News, May 7, 2012.

- "Consider the Shady Canyon Golf Club in Irvine, California, where the original initiation fee of $300,000 was reduced to $125,000 in 2011. Myrtle Beach's exclusive Members Club has cut initiation fees to $12,500 from $45,000 in 2005. Shaker Ridge Country Club in Albany, New York has waived its $6,000 initiation fee through June."

8. ***Dunn: Mesa Verde Country Club more than a golf course.*** By Richard Dunn, Orange County Register, November 21, 2013.

- "[L]ocal golfers have also purchased memberships at ultra-exclusive Shady Canyon Golf Club in Irvine…"

9. ***Dunn Deal: As host of golf events, Tom Sargent was an ace.*** By Richard Dunn, Orange County Register, October 31, 2019.

- "The event now also includes the ultra-exclusive Shady Canyon Golf Club in Irvine. Hosting duties rotate yearly among the five clubs."

10. ***Shady Canyon: One of OC's Most Prestigious Communities.*** Irvine Standard, November 2, 2021.

- "There are many good reasons why top business leaders, major league sports stars and diverse celebrities over the years have bought homes in Shady Canyon – Irvine's most exclusive, secluded, and prestigious neighborhood."
- "Shady Canyon today boasts some 400 mostly custom-designed homes, many inside gated areas, and perched at different heights along narrow, winding roads, to preserve views."
- "The project has been good for Irvine's local economy and tax base, attracting business leaders in tech and research and development industries and wealthy celebrities, including major league baseball stars Mark McGwire and Albert Pujols, tennis pro Lindsay Davenport and radio sports-show host Jim Rome. Film and stage actress Susan Egan and her husband, comedy producer Robert Hartmann, lived in Shady Canyon until 2015. Bestselling author Dean Koontz recently bought a second home in the neighborhood."
- "A major local draw is the Shady Canyon Golf Club, where the 300-acre course, designed by the celebrated architect Tom Fazio, encompasses large areas of protected open space and preserved creeks, following the natural contours of the valley. The land includes such carefully conserved natural habitat that it has been certified as an Audubon Cooperative Sanctuary."
- "The private club, which includes a 43,000-square-foot clubhouse, tennis courts and a 6,700-foot wellness center, is by invitation only, and you have to be sponsored, initiation fees reportedly run more than $100,000, on top of the monthly fees."

Charles F. Dender (*admitted pro hac vice*)
cdender@dicellolevitt.com
**DICELLO LEVITT LLP**
485 Lexington Ave., Suite 1001
New York, NY 10017
646-933-1000

Kristen L. Nelson (SBN 269318)
knelson@hechtpartners.com
**HECHT PARTNERS**
2121 Avenue of the Stars, Ste. 800
Century City, CA 90067
646 490-2408

*Attorneys for Plaintiff*
*RELATOR LLC*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**UNITED STATES OF AMERICA,**

Plaintiff,

*ex rel.* **RELATOR LLC**, a California limited liability company,

Relator,

v.

**STEVEN SUNSHINE**, an individual, **JON CHRISTY**, an individual, and **THE SHADY CANYON GOLF CLUB, INC.**, A California nonprofit corporation,

Defendants.

Case No. 8:23-cv-00134-JVS-ADS

**AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**

**FILED *IN CAMERA* UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

Plaintiff Relator LLC ("Plaintiff"), acting on its own behalf and on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., and Plaintiff the United States of America, for their Amended Complaint against Shady Canyon Golf Club, Inc. a California nonprofit corporation ("Shady Canyon CC"), its Chief Executive Officer ("CEO"), Steven Sunshine, and its Chief Financial Officer ("CFO"), Jon Cristy (collectively, the "Defendants"), and avers as follows:

## I. INTRODUCTION

1. This is an FCA action to recover treble damages and civil penalties against Defendants, who defrauded the Small Business Administration ("SBA") in connection with Shady Canyon CC's application for and receipt of $1,689,200 in COVID-19 pandemic-related Paycheck Protection Program ("PPP") funding (the "First Draw Loan")[1] in 2020 and the subsequent forgiveness—in its entirety—of that First Draw Loan in November 2020.

2. As is detailed in this Amended Complaint, the issuance and subsequent forgiveness of the First Draw Loan occurred during a time when Shady Canyon CC's revenue streams were guaranteed, which, unlike the great majority of American businesses, enjoyed security and resilience during the pandemic, in terms of both its revenue and operating income and its corresponding ability to gainfully maintain its entire workforce and pay all payroll expenses.

3. Shady Canyon CC is a private country club located in Irvine, California. As a ***private*** country club, Shady Canyon CC was ineligible to participate in the PPP, as any private club that limited its membership for reasons other than capacity were explicitly barred from participating, and therefore ineligible. Shady Canyon CC limits its membership for a variety of reasons—the exorbitant costs being only one of those reasons—other than capacity and was

[1] The PPP provided for two separate loans: a First Draw Loan and a Second Draw Loan. Defendants only applied for the First Draw Loan.

therefore ineligible. Shady Canyon's CEO and CFO were aware (or should have been aware) that Shady Canyon CC was ineligible, yet they approved the submission of the PPP First Draw Loan application—and the subsequent forgiveness application—despite that ineligibility. The submission of the PPP First Draw Loan application and the subsequent forgiveness application were false claims against the Government.

4. Moreover, because its' revenues are derived mainly from costly membership dues paid by affluent members, Shady Canyon CC faced no economic uncertainty during the COVID-19 pandemic and required no payroll support and needed no emergency access to a taxpayer subsidized influx of operating capital, or any other economic assistance, from the federal Government. Shady Canyon CC's CEO and CFO approved the improper PPP First Draw Loan application and subsequent forgiveness application despite knowing that that Shady Canyon CC faced no economic uncertainty.

5. Indeed, unlike the pain and uncertainty that the great majority of American businesses confronted during the COVID-19 outbreak and resulting Government shutdown mandates, Shady Canyon CC *benefitted* from the shutdowns, since it wealthy membership found themselves with more time to enjoy the benefits of their private membership at their private country club and were able to spend additional dollars at the club—Shady Canyon CC's secondary source of revenue generation.

6. Shady Canyon CC, however, was never eligible to partake in PPP, and therefore violated the FCA when it certified that it was in fact eligible. Under the PPP, private clubs (such as Shady Canyon CC) that limit the number of memberships for reasons other than capacity were ineligible to receive PPP loans.

7. To wit, if a private club excluded people for any reason other than *capacity* reasons (which Shady Canyon CC did) then they were not allowed to have the American Taxpayer fund their business. Shady Canyon CC is not open to the

general public (that is, it is **not** a public golf course). It is a private, members-only club. There are many restrictions to joining Shady Canyon CC that have nothing to do with the club's capacity.

8. Put simply, when Defendants applied for and received the First Draw Loan in April 2020, they made a series of materially false and fraudulent misstatements on their loan application. Then, unsatisfied with the boost of ultra-low interest, and unneeded operating capital during a time of revenue *growth*, Shady Canyon CC fraudulently obtained forgiveness of the First Draw Loan from the SBA in November 2020, converting the loan into a Government grant.

9. Defendants lied on the First Draw Loan forgiveness application about their eligibility for the First Draw Loan, how they used the money, and that it had been needed in the first place. That is, they falsely certified on that application that Shady Canyon CC needed access to operating funds, when they knew they did not.

10. Plaintiffs now seek to hold Defendants accountable for their conduct, mitigate the fiscal impact of the fraudulent scheme, and reimburse the Government for Defendants' fraudulent diversion of taxpayer funds.

## II. JURISDICTION AND VENUE

11. This is a civil action to redress violations of the FCA, 31 U.S.C. §§ 3729 et seq. This Court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; (ii) pursuant to 28 U.S.C. § 1331, which confers federal question jurisdiction; and (iii) pursuant to 28 U.S.C. § 1345, because the United States is a plaintiff.

12. This Court has personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because Defendants have at least minimum contacts with the United States. In addition, acts proscribed by 31 U.S.C. § 3729 have occurred in the United States. Moreover, Defendants can be found in, reside, or transact or have transacted

business in California.

13. Venue is proper in the Central District of California pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants conduct business in this District and because one or more acts proscribed by 31 U.S.C. §§ 3729 et seq. occurred in this District.

14. At or prior to the time Relator filed the Complaint, Relator provided to the Attorney General of the United States and to the United States Attorney for the Central District of California a statement summarizing known material evidence and information related to the Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2). The disclosure statement was and is supported by material evidence. Relator is the original source of such evidence and information, none of which has previously been disclosed publicly prior to the filing of this Complaint.

## III. THE PARTIES

15. Plaintiff, a California limited liability company with its principal place of business in Los Angeles, California. Pursuant to 31 U.S.C. § 3730(b)(1), Plaintiffs bring this action both on their own behalf and on behalf of the United States of America.

16. Defendant Steven Sunshine is an individual and, at all relevant times herein, is and was the CEO of Shady Canyon CC.

17. Defendant Jon Christy is an individual and, at all relevant times herein, is and was the CFO of Shady Canyon CC.

18. Defendant Shady Canyon CC, is a California nonprofit corporation with its principal place of business in Irvine, California.

19. During round 1 of the paycheck protection program, Shady Canyon CC applied for a PPP loan for $1,689,200.00. It was approved on April 3, 2020, by the SBA for the full amount. The loan was facilitated by Commercial Bank of California. Shady Canyon CC received 100% of the approved amount. On its application for this loan, Shady Canyon CC stated that it had 160 employees,

thereby reflecting an average salary of $50,676.00 per year. The loan is hereafter referred to as "PPP Loan." This loan was forgiven on November 3, 2020.

## BACKGROUND

### I. THE FALSE CLAIMS ACT

20. The FCA has been the Government's primary fraud fighting tool since the Civil War era and provides the Government with its main means of recovery for frauds against the public fisc. *Qui tam* provisions encourage private citizens with information about fraud (known as "relators") to sue on the Government's behalf. The FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.

21. The Government has used the FCA to combat fraud in connection with PPP loans.[2]

22. The FCA provides that any person who "'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), is liable to the United States for civil penalties "plus three (3) times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

23. "Knowingly" is defined to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id*.

24. "Claim" is defined in the statute to mean "any request or demand,

[2] The first FCA settlement involving PPP loans was announced on September 13, 2022. The Government press release is available here: Southern District of Texas | First-ever False Claims Act settlement received from Paycheck Protection Program lender | United States Department of Justice.

whether under a contract or otherwise, for money or property" which is "presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A). Alternatively, it is "any request or demand, whether under a contract or otherwise, for money or property" which is "made to a contractor, grantee, or other recipient" of federal funds, if the money is spent on behalf of the Government or to advance a Government program or interest, and if the Government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.*

25. "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4).

## II. THE PAYCHECK PROTECTION PROGRAM

26. On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.[3] The CARES Act was the Government's initial economic response to the COVID-19 pandemic, and it included the PPP,[4] which authorized up to $349 billion in forgivable loans (known as PPP First Draw Loans) to qualifying small businesses, to facilitate job retention and certain other permitted business expenses.[5] These loans were to be underwritten by private banks but were funded and guaranteed by the SBA, which would then forgive (pay off) the loan balances if certain criteria were met.

27. In April 2020, Congress authorized over $300 billion in additional PPP funding.[6] The CARES Act funding for PPP ended on August 8, 2020. By that time, there were roughly $525 billion in PPP loans made to approximately 5.2 million

---

[3] Pub. L. No. 116-136, 134 Stat. (Mar. 27, 2020).

[4] Regulations.gov.

[5] SBA Paycheck Protection Program ("PPP") Loan Forgiveness: In Brief, *available at*, R46397.pdf.

[6] *Id.*

businesses.

28. To obtain a PPP First Draw Loan, a qualifying business had to submit a loan application signed by an authorized representative, typically to a private bank which would issue the loan with minimal underwriting, subject to an SBA guarantee and ultimately funded by the SBA.[7]

29. To qualify for a PPP First Draw Loan, a business had to certify on its application, among other things, that it (i) was "eligible to receive a loan under the rules in effect at the time this application [was] submitted …" (ii) faced economic uncertainty due to the COVID-19 pandemic; (iii) would use the PPP First Draw Loan funds to maintain its existing payroll and to cover certain qualified expenses; and (iv) would not seek forgiveness of more than 25% of the loan for non-payroll costs.[8]

30. On April 23, 2020, the SBA updated the FAQ page on its PPP website to address questions that had arisen over the meaning of the requirement that "current economic conditions [made] the PPP loan request 'necessary' to support the ongoing operation of that eligible applicant." The SBA's updates made clear:

a. Applicants must certify they are eligible to participate in PPP;
b. "Applicants must make a reasonable, good faith determination of need";
c. "Applicants must assess their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business"; and
d. "Applicants that receive a PPP loan should maintain records supporting their determination of need and be ready to demonstrate to a federal regulator the basis for having made their certification."[9]

---

[7] The version of the PPP First Draw Borrower Application Form (the "First Draw Loan Application") submitted by Slifco is attached as Exhibit 1 to this Complaint.

[8] Exhibit 1at 2.

[9] Good-Faith Determinations under the CARES Act Paycheck Protection Program.

31. The Treasury Department then issued guidance on the meaning of "economic uncertainty" on April 24, 2020. According to the Treasury Department, the true test for economic uncertainty, as required for a PPP loan, was an applicant business's liquidity streams:

> Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that '[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.' Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business.[10]

32. PPP applicants also acknowledged that false certifications on their applications would violate federal law and be punishable by imprisonment and civil fines, including violations of: (i) 18 U.S.C. §§ 1001, 1004, 3571; (ii) 15 U.S.C. § 645; and (iii) the FCA, 31 U.S.C. §§ 3729 *et seq*.

33. After receiving a PPP First Draw Loan, a qualifying business could seek forgiveness of part of, or all of, the loan balance. Depending on the lender, a forgiveness application would be submitted either to the bank or directly to the SBA. In either event, if the application was approved, then the SBA would pay off the forgiven portion of the loan balance, converting the First Draw Loan (or part thereof) into a Government grant.

34. The PPP required First Draw Loan recipients seeking forgiveness of their loan balance to certify that during an 8 or 24 week "covered period" following the disbursement of the First Draw Loan, the loan proceeds:

35. were "used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures;

---

[10] https://www.bsk.com/news-events-videos/the-ldquouncertaintyrdquo-of-the-paycheck-protection-program-economic-uncertainty-certification.

covered property damage costs; covered supplier costs; or covered worker protection expenditures);”[11] and

36. were used to cover “payroll costs equal to at least 60% of the forgiveness amount.” [12]

37. To receive forgiveness for the PPP First Draw Loan, a recipient also had to certify: “I understand that if the funds were knowingly used for unauthorized purposes, the federal Government may pursue recovery of loan amounts and/or civil or criminal fraud charges.”[13]

38. Finally, to receive forgiveness for the PPP First Draw Loan, a recipient also had to certify: “[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects.”[14]

## STATEMENT OF FACTS

### III. THE COUNTRY CLUB BORROWER FRAUDULENTLY OBTAINED PPP FUNDS

#### A. Defendants Made Material False Statements and False Certifications to the Government to Obtain the First Draw Loan and Its Forgiveness

39. On April 3, 2020, Shady Canyon CC received a PPP First Draw Loan in the amount of $1,689,200. The lender for Shady Canyon CC’s First Draw Loan was the Commercial Bank of California.

40. To obtain the PPP First Draw Loan, Shady Canyon CC’s CEO and CFO falsely certified—or approved the false certification—on the PPP First Draw

[11] A version of the PPP First Draw Loan Forgiveness Application Form 3508 is attached as Exhibit 2. The certifications appear on pages 2-3.

[12] *Id.* at 2.

[13] *Id.*

[14] *Id.* at 3.

Loan application that Shady Canyon CC was eligible to participate in the PPP.[15] As described in detail below, this certification was false, because Shady Canyon CC was a private club that excluded membership for reasons other than capacity.

41. Also, to obtain the PPP First Draw, Defendants falsely certified on the loan application that "current economic uncertainty makes this loan request necessary to support the ongoing operations of [Shady Canyon CC]."[16] As described in detail below, this certification was false, because Shady Canyon CC's main source of revenue was guaranteed, their secondary source of income was enjoying steady growth, and the loan was not necessary to support Shady Canyon CC's ongoing operations. Shady Canyon CC's CEO and CFO falsely certified—or approved the false certification.

42. Defendants further falsely certified on the loan application that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the [PPP] Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal Government may hold me legally liable, such as for charges of fraud."[17]

43. This certification was false because the PPP funds were not used (or intended to be used) to retain workers or to make the specified payments. As described in detail below, Shady Canyon CC's employees were retained without impairment (or the need for additional liquidity) on account of Shady Canyon CC's steady revenues both before and after the PPP loan period. Shady Canyon CC's CEO and CFO falsely certified—or approved the false certification.

44. Defendants' false certifications were material to the issuance of the First Draw Loan, because had the certifications not been made or had the SBA or the Commercial Bank of California known that the certifications were false, the

[15] Exhibit 1 at 2.
[16] Exhibit 1 at 2.
[17] *Id.*

loan would not have been issued.

45. Shady Canyon CC subsequently submitted to the SBA, through the Commercial Bank of California, an application seeking to forgive the entire balance of its PPP First Draw Loan. Shady Canyon CC's CEO and CFO falsely certified—or approved the false certification.

46. In seeking forgiveness of the First Draw Loan, Defendants falsely certified on the forgiveness application that "the dollar amount for which forgiveness [was] requested was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures)."[18]

47. Defendants further falsely certified on the forgiveness application that "the dollar amount for which forgiveness [was] requested include[d] payroll costs equal to at least 60% of the forgiveness amount."[19]

48. Again, these certifications were false because the Defendants sought forgiveness for amounts that were not spent on eligible business costs or other eligible costs, as certified.

49. Defendants also acknowledged on the forgiveness application that "if the funds were knowingly used for unauthorized purposes, the federal Government may pursue recovery of loan amounts and/or civil or criminal fraud charges."[20]

50. On November 3, 2020 the SBA, relying on Defendants' certifications, granted Shady Canyon CC's loan forgiveness application and forgave all $1,689,200 of Shady Canyon CC's First Draw Loan, paying off the Commercial Bank of California and essentially converting the loan into a Government grant.

[18] Exhibit 2 at 2.
[19] *Id.*
[20] *Id.*

51. Defendants' false certifications were material to the forgiveness of the First Draw Loan. Had the certifications not been made or had the SBA or the Commercial Bank of California known that the certifications were false, the loan would not have been forgiven.

52. Although Shady Canyon CC's direct counterparty in these PPP transactions was a private bank, Defendants' applications for the issuance and the forgiveness of the First Draw Loan constitute "claims" against the United States under the FCA, insofar as they constituted a "request or demand, whether under a contract or otherwise, for money or property" which was "made to a contractor, grantee, or other recipient" of federal funds (to wit, the Commercial Bank of California), where the money was spent on behalf of the Government or to advance a Government program or interest, and where the Government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

53. The Commercial Bank of California was, at all relevant times, acting as a contractor, grantee, or agent of the SBA, insofar as the initial loan was funded and guaranteed by the SBA and the balance was ultimately paid off by the SBA when the First Draw Loan was forgiven.

**B. The Country Club Borrower's Status as a Private Club that Limited Its' Membership Roles for Something Other Than Capacity Rendered Their PPP Certifications Knowingly False**

54. Defendants' statements and certifications in connection with Defendants' applications for and receipt of the First Draw Loan and their application for and receipt of forgiveness of that loan, as catalogued supra in paragraphs 37-51 and the annexed exhibits, were false. Defendants knew they were false when they made them.

55. Contrary to Defendants' certifications that Shady Canyon CC "[was]

eligible to receive a loan under the rules in effect at the time this application was submitted …”, Defendants knew that their policies limited their membership roles for a reason other than capacity which rendered them ineligible to apply for, much less receive, the PPP First Draw Loan.

56. Shady Canyon CC is a private club that charges its wealthy members high fees to become members of the club. Therefore, Shady Canyon CC limited its membership roles to only potential members that could afford the high membership fees (and other mandatory expenditures to maintain those memberships).

57. Moreover, even for potential members that can afford to join Shady Canyon CC, Shady Canyon CC has in place a strict policy for only admitting as new members, those that pass certain criteria and are approved for membership by a committee established and overseen by Shady Canyon CC.

58. This misrepresentation was made knowingly and was material to the SBA's decision to loan (and then later to forgive) Shady Canyon CC's First Draw Loan. Shady Canyon CC's CEO and CFO falsely certified—or approved the false certifications.

**C. The Country Club Borrower's Guaranteed Revenue—and Indeed, Revenue Growth—Rendered Their PPP Certifications Knowingly False**

59. Moreover, contrary to Defendants' certifications that "current economic uncertainty makes this loan request necessary to support the ongoing operations of [Shady Canyon CC]," Shady Canyon CC was faced with no economic uncertainty at all due to the pandemic and needed no assistance to maintain its payroll. Moreover, Shady Canyon CC was not faced with any liquidity crunch in that time frame, as its' members were all legally obligated to maintain their membership dues, and continued to spend additional cash at the Club.

**D. Defendants Falsely Certified their Use of the PPP Funds**

60. In the First Draw Loan Application, Defendants certified that "[t]he

funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments. . . ."[21]

61. These certifications were false, and Defendants knew they were false at the time they made them. Shady Canyon CC did not use the PPP funds to retain workers or maintain payroll or to pay for other qualified expenses, because no such support was needed.

62. For example, Shady Canyon CC's grounds crew were all deemed essential employees in California during the COVID-19 pandemic.

63. Moreover, outdoor activities (including working) were encouraged during the COVID-19 pandemic, and many of Shady Canyon CC's employees (not to mention all golf activities and Shady Canyon CC's resort style pool) were outdoor activities.

64. Nor did Shady Canyon CC need any assistance "mak[ing] mortgage interest payments, lease payments, and utility payments" during this time.

## IV. DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

65. As discussed above, "knowing" is defined in the FCA to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id*.

66. Defendants had actual knowledge that their certifications in connection with the PPP First Draw Loan were false and fraudulent and that Shady Canyon CC was not eligible to receive those funds. This actual knowledge had at least five sources:

67. ***First***, Defendants knew they were ineligible to receive a PPP First Draw Loan because they were a private country club that limited their membership for reasons other than capacity restrictions.

[21] Exhibit 1 at 2.

68. ***Second***, Defendants knew that the source of Shady Canyon CC's revenue was secure and that it would not be affected by the pandemic. Relatedly, Defendants knew that Shady Canyon CC would not face any liquidity issues during the pandemic because the bulk of the pandemic era restrictions were aimed at indoor activities, not outdoor activities such as golf.

69. ***Third***, Defendants knew that the membership base it had was being expanded due to wealthy non-members deciding to join the private club because of the Government shutdowns.

70. ***Fourth***, Defendants had access to Shady Canyon CC's actual books and records, its monthly revenue projections, and its payroll data, all of which showed that it was not experiencing economic uncertainty and did not need Government support.

71. ***Fifth***, Defendants knew how they were actually spending the money received from the First Draw Loan and knew that these expenditures were not eligible under the program.

72. Defendants additionally and alternatively had constructive knowledge of the falsity of Shady Canyon CC's PPP First Draw Loan and forgiveness applications, and the certifications contained therein. At the very least, in failing to take any steps whatsoever to ensure that moneys received from the Government were appropriately spent and accounted for, Defendants acted in deliberate ignorance and reckless disregard of the truth or falsity of the information they were certifying to support their claims.

## V. RELATORS' STANDING

73. This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation or in a Government Accountability Office (GAO) or Auditor General's report, hearing, audit, or investigation, or from the news media. Nor have there been any Congressional hearings, Government audits or investigations, news media accounts,

or criminal, civil, or administrative hearings or lawsuits specifically addressing that issue.

74. There has been no previous disclosure or allegation by anyone in any forum ***concerning Defendants' false and fraudulent certifications relating to PPP loan applications and forgiveness***.

75. All facts alleged herein were discovered in the first instance by the Relator, who disclosed them to the Government prior to filing this *qui tam* suit under seal.

76. To the extent there has been a public disclosure unknown to Relator, Relator is an original source under 31 U.S.C. § 3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations in this Complaint are based and voluntarily provided the information to the Government before filing a qui tam action based on the information. The allegations and causes of action set forth herein would not have come to light had it not been for Relators' knowledge,

## CAUSES OF ACTION

## COUNT I

Presenting False or Fraudulent Claims –
PPP First Draw Loan and Forgiveness Applications
(31 U.S.C. § 3729.(a)(1)(A-B))
All Defendants

77. Relator realleges paragraphs 1 to 80 and incorporates them by reference as if fully set forth herein.

78. In applying for First Draw PPP Loan in 2020, and in applying for forgiveness of that loan in 2020, Defendants knowingly presented or caused to be presented to the United States materially false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

79. These claims included requests or demands for money or property that Defendants presented or caused to be presented to an officer, employee, or agent of

the United States, as well as requests or demands for money or property made to a contractor, grantee, or other recipient of federal funds, where the money was spent on behalf of the Government or to advance a Government program or interest, and where the Government provided or has provided a portion of the money or property requested or demanded.

80. The claims submitted were false and fraudulent, insofar as they contained material statements of fact that Defendants knew were not true, and insofar as the claims sought payment from the Government that Defendants knew they were not eligible to receive. Defendants knew that the claims were false and fraudulent at the time they submitted them and therefore acted with the requisite scienter.

81. The false and fraudulent claims submitted by Defendants were material to the Government's decision to pay: had Defendants not submitted the loan and forgiveness applications, or had the Government known of their falsity, the loans would not have been issued or forgiven.

82. By reason of Defendants' false and fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial and is entitled to treble damages plus a civil penalty for each violation. 31 U.S.C. § 3729(a)(1).[22]

**COUNT II**

Making or Using False Records or Statements
Material to False or Fraudulent Claims --
PPP First Draw Loan and Forgiveness Applications
31 U.S.C. § 3729.(a)(1)(B)
All Defendants

83. Relator realleges paragraphs 1 to 80 and incorporates them by

[22] Where the Government would have paid nothing if it had known the truth, the entire amount paid by the Government as a result of a false claim is the basis for damages, before trebling and penalties. *See United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008); *United States v. Alackby*, 339 F.3d 1013, 1014-15 (9th Cir. 2003); *U.S. ex rel. Emanuele v. Medicor Assocs.*, No. CV 10-245, 2017 WL 4867614, at *9 (W.D. Pa. Oct. 26, 2017) (collecting cases).

reference as if fully set forth herein.

84. In connection with each and every false or fraudulent claim that is the subject of Count I, Defendants knowingly made, used, or caused to be made or used, one or more false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).

85. Specifically, in connection with each of Shady Canyon CC's application for the First Draw PPP Loan in 2020, and its application for forgiveness of that loan in 2021, Defendants certified to the truth of one or more statements relating to Shady Canyon CC's eligibility for and intended use of the PPP funds, as detailed above. These certifications were false or fraudulent, and Defendants knew they were false and fraudulent at the time they submitted them.

86. The false and fraudulent statements, and any records submitted with them, were material to the Government's decision to pay: had Defendants not made the certifications, or had the Government known of their falsity, the loan would not have been issued or forgiven.

87. By reason of Defendants' false and fraudulent records and statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation. 31 U.S.C. § 3729(a)(1).

## COUNT III

Unjust Enrichment
All Defendants

88. Relator realleges paragraphs 1 to 80 and incorporates them by reference as if fully set forth herein.

89. By receiving and retaining nearly $1.7 million in PPP funds – a loan which was subsequently forgiven and converted to grants – to which they had no entitlement as a matter of law under the CARES Act and the Economic Aid Act (and implementing regulations), Defendants have been unjustly enriched.

90. As a matter of conscience and equity, Defendants should not be allowed to retain funds belonging to U.S. taxpayers to which they are not entitled as a matter of law and by which they are unjustly enriched, and they must be made to disgorge such funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

1. On Counts One and Two (FCA), in favor of the Plaintiffs in an amount equal to three times the damages sustained by the United States on account of Defendant's actions, plus civil penalties in the maximum amount allowed by law;
2. On Count Three (Unjust Enrichment), in favor of the United States in an amount necessary to disgorge from Defendants and restore to the Government the total amount by which Defendants were unjustly enriched;
3. On all counts, in favor of the Plaintiff in the maximum amount allowable under the FCA for the relator's share of the Government's recovery;
4. On all counts, in favor of the Plaintiff for his reasonable attorneys' fees and costs incurred in bringing the case; and
5. For all other and further relief as may be allowed by law and as the Court may deem just and proper under the circumstances.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial as to all matters so triable.

Dated: July 30, 2025

DICELLO LEVITT LLP

By: /s/ *Charles F. Dender*

Charles F. Dender
**DICELLO LEVITT LLP**
1485 Lexington Ave., Suite 1001
New York, NY 10017
cdender@dicellolevitt.com

Kristen L. Nelson (SBN 269318)
**HECHT PARTNERS**
2121 Avenue of the Stars, Ste. 800
Los Angeles, CA 90067
knelson@hechtpartners.com

*Attorneys for Plaintiff*
*RELATOR LLC*

# Exhibit 1

**Paycheck Protection Program**
**Borrower Application Form**

OMB Control No.: 3245-0407
Expiration Date: 09/30/2020

| **Check One:** ❑ Sole proprietor ❑ Partnership ❑ C-Corp ❑ S-Corp ❑ LLC<br>❑ Independent contractor ❑ Eligible self-employed individual<br>❑ 501(c)(3) nonprofit ❑ 501(c)(19) veterans organization<br>❑ Tribal business (sec. 31(b)(2)(C) of Small Business Act) ❑ Other | **DBA or Tradename if Applicable** | |
|---|---|---|
| **Business Legal Name** | | |
| | | |
| **Business Address** | **Business TIN (EIN, SSN)** | **Business Phone** |
| | | ( ) - |
| | **Primary Contact** | **Email Address** |
| | | |

| Average Monthly Payroll: | $ | x 2.5 + EIDL, Net of Advance (if Applicable) Equals Loan Request: | $ | Number of Employees: | |
|---|---|---|---|---|---|
| Purpose of the loan (select more than one): | ☐Payroll ☐Lease / Mortgage Interest ☐Utilities ☐Other (explain):_________________ | | | | |

**Applicant Ownership**

List all owners of 20% or more of the equity of the Applicant. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN, SSN) | Address |
|---|---|---|---|---|
| | | | | |
| | | | | |

*If questions (1) or (2) below are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 1. Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy? | ☐ | ☐ |
| 2. Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government? | ☐ | ☐ |
| 3. Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A. | ☐ | ☐ |
| 4. Has the Applicant received an SBA Economic Injury Disaster Loan between January 31, 2020 and April 3, 2020? If yes, provide details on a separate sheet identified as addendum B. | ☐ | ☐ |

*If questions (5) or (6) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 5. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?<br>Initial here to confirm your response to question 5 → ______________ | ☐ | ☐ |
| 6. Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)?<br>Initial here to confirm your response to question 6 → ______________ | ☐ | ☐ |
| 7. Is the United States the principal place of residence for all employees of the Applicant included in the Applicant's payroll calculation above? | ☐ | ☐ |
| 8. Is the Applicant a franchise that is listed in the SBA's Franchise Directory? | ☐ | ☐ |

**Paycheck Protection Program**
**Borrower Application Form**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

For Applicants who are individuals: I authorize the SBA to request criminal record information about me from criminal justice agencies for the purpose of determining my eligibility for programs authorized by the Small Business Act, as amended.

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

_____ The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

_____ Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

_____ The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

_____ The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

_____ I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

_____ During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

_____ I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

_____ I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

______________________________________________ ____________________
Signature of Authorized Representative of Applicant Date

______________________________________________ ____________________
Print Name Title

**Paycheck Protection Program**
**Borrower Application Form**

**Purpose of this form:**

This form is to be completed by the authorized representative of the Applicant and ***submitted to your SBA Participating Lender***. Submission of the requested information is required to make a determination regarding eligibility for financial assistance. Failure to submit the information would affect that determination.

**Instructions for completing this form:**

With respect to "purpose of the loan," payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wage, commissions, income, or net earnings from self-employment or similar compensation.

For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee. For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

If Applicant is refinancing an Economic Injury Disaster Loan (EIDL): Add the outstanding amount of an EIDL made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID-19 loan, to Loan Request as indicated on the form.

All parties listed below are considered owners of the Applicant as defined in 13 CFR § 120.10, as well as "principals":

- For a sole proprietorship, the sole proprietor;
- For a partnership, all general partners, and all limited partners owning 20% or more of the equity of the firm;
- For a corporation, all owners of 20% or more of the corporation;
- For limited liability companies, all members owning 20% or more of the company; and
- Any Trustor (if the Applicant is owned by a trust).

**Paperwork Reduction Act** – You are not required to respond to this collection of information unless it displays a currently valid OMB Control Number. The estimated time for completing this application, including gathering data needed, is 8 minutes. Comments about this time or the information requested should be sent to : Small Business Administration, Director, Records Management Division, 409 3rd St., SW, Washington DC 20416., and/or SBA Desk Officer, Office of Management and Budget, New Executive Office Building, Washington DC 20503.

**Privacy Act (5 U.S.C. 552a)** – Under the provisions of the Privacy Act, you are not required to provide your social security number. Failure to provide your social security number may not affect any right, benefit or privilege to which you are entitled. (But see Debt Collection Notice regarding taxpayer identification number below.) Disclosures of name and other personal identifiers are required to provide SBA with sufficient information to make a character determination. When evaluating character, SBA considers the person's integrity, candor, and disposition toward criminal actions. Additionally, SBA is specifically authorized to verify your criminal history, or lack thereof, pursuant to section 7(a)(1)(B), 15 USC Section 636(a)(1)(B) of the Small Business Act (the Act).

**Disclosure of Information** – Requests for information about another party may be denied unless SBA has the written permission of the individual to release the information to the requestor or unless the information is subject to disclosure under the Freedom of Information Act. The Privacy Act authorizes SBA to make certain "routine uses" of information protected by that Act. One such routine use is the disclosure of information maintained in SBA's system of records when this information indicates a violation or potential violation of law, whether civil, criminal, or administrative in nature. Specifically, SBA may refer the information to the appropriate agency, whether Federal, State, local or foreign, charged with responsibility for, or otherwise involved in investigation, prosecution, enforcement or prevention of such violations. Another routine use is disclosure to other Federal agencies conducting background checks but only to the extent the information is relevant to the requesting agencies' function. See, 74 F.R. 14890 (2009), and as amended from time to time for additional background and other routine uses. In addition, the CARES Act, requires SBA to register every loan made under the Paycheck Protection Act using the Taxpayer Identification Number (TIN) assigned to the borrower.

**Debt Collection Act of 1982, Deficit Reduction Act of 1984 (31 U.S.C. 3701 et seq. and other titles)** – SBA must obtain your taxpayer identification number when you apply for a loan. If you receive a loan, and do not make payments as they come due, SBA may: (1) report the status of your loan(s) to credit bureaus, (2) hire a collection agency to collect your loan, (3) offset your income tax refund or other amounts due to you from the Federal Government, (4) suspend or debar you or your company from doing business with the Federal Government, (5) refer your loan to the Department of Justice, or (6) foreclose on collateral or take other action permitted in the loan instruments.

**Right to Financial Privacy Act of 1978 (12 U.S.C. 3401)** – The Right to Financial Privacy Act of 1978, grants SBA access rights to financial records held by financial institutions that are or have been doing business with you or your business including any financial

institutions participating in a loan or loan guaranty. SBA is only required provide a certificate of its compliance with the Act to a financial institution in connection with its first request for access to your financial records. SBA's access rights continue for the term of any approved loan guaranty agreement. SBA is also authorized to transfer to another Government authority any financial records concerning an approved loan or loan guarantee, as necessary to process, service or foreclose on a loan guaranty or collect on a defaulted loan guaranty.

**Freedom of Information Act (5 U.S.C. 552)** – Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity. Proprietary data on a borrower would not routinely be made available to third parties. All requests under this Act are to be addressed to the nearest SBA office and be identified as a Freedom of Information request.

**Occupational Safety and Health Act (15 U.S.C. 651 et seq.)** – The Occupational Safety and Health Administration (OSHA) can require businesses to modify facilities and procedures to protect employees. Businesses that do not comply may be fined, forced to cease operations, or prevented from starting operations. Signing this form is certification that the applicant, to the best of its knowledge, is in compliance with the applicable OSHA requirements, and will remain in compliance during the life of the loan.

**Civil Rights (13 C.F.R. 112, 113, 117)** – All businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations. All borrowers must display the "Equal Employment Opportunity Poster" prescribed by SBA.

**Equal Credit Opportunity Act (15 U.S.C. 1691)** – Creditors are prohibited from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status or age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

**Debarment and Suspension Executive Order 12549; (2 CFR Part 180 and Part 2700)** – By submitting this loan application, you certify that neither the Applicant or any owner of the Applicant have within the past three years been: (a) debarred, suspended, declared ineligible or voluntarily excluded from participation in a transaction by any Federal Agency; (b) formally proposed for debarment, with a final determination still pending; (c) indicted, convicted, or had a civil judgment rendered against you for any of the offenses listed in the regulations or (d) delinquent on any amounts owed to the U.S. Government or its instrumentalities as of the date of execution of this certification.

# Exhibit 2

OMB Control No.: 3245-0407
Expiration Date: 01/31/2022

**Paycheck Protection Program**
**Loan Forgiveness Application Form 3508 Revised July 30, 2021**

## PPP Loan Forgiveness Calculation Form

| Business Legal Name ("Borrower") | | DBA or Tradename, if applicable | |
|---|---|---|---|
| | | | |
| **Business Address** | **NAICS Code** | **Business TIN (EIN, SSN, ITIN)** | **Business Phone** |
| | | | ( ) - |
| | | **Primary Contact** | **E-mail Address** |
| | | | |

☐ **First Draw PPP Loan** ☐ **Second Draw PPP Loan** (check one)

**SBA PPP Loan Number:**________________________ **Lender PPP Loan Number:** _________________________

**PPP Loan Amount:**_____________________________ **PPP Loan Disbursement Date:** ______________________

**Amount of PPP Loan Increase (if applicable):**_____________ **Date of PPP Loan Increase (if applicable):** ______________

**Employees at Time of Loan Application:** __________ **Employees at Time of Forgiveness Application:** _______

**Covered Period**:________________________to ________________________

**Forgiveness Amount Calculation:**

Payroll and Nonpayroll Costs
Line 1. Payroll Costs (enter the amount from PPP Schedule A, line 10): ____________________

Line 2. Business Mortgage Interest Payments: ____________________

Line 3. Business Rent or Lease Payments: ____________________

Line 4. Business Utility Payments: ____________________

Line 5. Covered Operations Expenditures: ____________________

Line 6. Covered Property Damage Costs: ____________________

Line 7. Covered Supplier Costs: ____________________

Line 8. Covered Worker Protection Expenditures: ____________________

Adjustments for Full-Time Equivalency (FTE) and Salary/Hourly Wage Reductions
Line 9. Total Salary/Hourly Wage Reduction (enter the amount from PPP Schedule A, line 3): ____________________

Line 10. Sum the amounts on lines 1 through 8, then subtract the amount entered in line 9: ____________________

Line 11. FTE Reduction Quotient (enter the number from PPP Schedule A, line 13): ____________________

Potential Forgiveness Amounts
Line 12. Modified Total (multiply line 10 by line 11): ____________________

Line 13. PPP Loan Amount: ____________________

Line 14. Payroll Cost 60% Requirement (divide line 1 by 0.60): ____________________

Forgiveness Amount
Line 15. Forgiveness Amount (enter the smallest of lines 12, 13, and 14): ____________________

**Paycheck Protection Program**
**Loan Forgiveness Application Form 3508 Revised July 30, 2021**

OMB Control No.: 3245-0407
Expiration Date: 01/31/2022

## PPP Borrower Demographic Information (Optional)

### Instructions

1. **Purpose**. Veteran/gender/race/ethnicity data is collected for program reporting purposes only.
2. **Description**. This form requests information about each of the Borrower's Principals. Add additional sheets if necessary.
3. **Definition of Principal**. The term "Principal" means:
   - For a self-employed individual, independent contractor, or a sole proprietor, the self-employed individual, independent contractor, or sole proprietor.
   - For a partnership, all general partners and all limited partners owning 20% or more of the equity of the Borrower, or any partner that is involved in the management of the Borrower's business.
   - For a corporation, all owners of 20% or more of the Borrower, and each officer and director.
   - For a limited liability company, all members owning 20% or more of the Borrower, and each officer and director.
   - Any individual hired by the Borrower to manage the day-to-day operations of the Borrower ("key employee").
   - Any trustor (if the Borrower is owned by a trust).
   - For a nonprofit organization, the officers and directors of the Borrower.
4. **Principal Name**. Insert the full name of the Principal.
5. **Principal Position**. Identify the Principal's position; for example, self-employed individual; independent contractor; sole proprietor; general partner; owner; officer; director; member; or key employee.

| Principal Name | | Principal Position |
|---|---|---|
| | | |
| | Select Response Below: | |
| Veteran | ☐Non-Veteran; ☐Veteran; ☐Service-Disabled Veteran; ☐Spouse of Veteran; ☐Not Disclosed | |
| Gender | ☐Male; ☐Female; ☐Not Disclosed | |
| Race (more than 1 may be selected) | ☐American Indian or Alaska Native; ☐Asian; ☐Black or African-American; ☐Native Hawaiian or Pacific Islander; ☐White; ☐Not Disclosed | |
| Ethnicity | ☐Hispanic or Latino; ☐Not Hispanic or Latino; ☐Not Disclosed | |

**Disclosure is voluntary and will have no bearing on the loan forgiveness decision**

**By Signing Below, You Make the Following Representations and Certifications on Behalf of the Borrower:**
The authorized representative of the Borrower certifies to all of the below by **initialing** next to each one. The terms "payroll" and "payroll costs" as used in the below certifications include proprietor expenses (business expenses plus owner compensation) for Borrowers that applied for loans using SBA Form 2483-C or 2483-SD-C.

_____ The dollar amount for which forgiveness is requested (which does not exceed the principal amount of the PPP loan):
- was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures);
- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;
- includes payroll costs equal to at least 60% of the forgiveness amount;
- for any owner-employee (with an ownership stake of 5% or more) or self-employed individual/general partner, does not exceed 2.5 months' worth of compensation received during the year used to calculate the PPP loan amount, capped at $20,833 per individual in total across all businesses.

_____ I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

_____ The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.

_____ I have submitted to the Lender the required documentation verifying payroll costs, the existence of obligations and service (as applicable) prior to February 15, 2020, and eligible business mortgage interest payments, business rent or lease payments, business utility payments, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures.

**Paycheck Protection Program**
**Loan Forgiveness Application Form 3508 Revised July 30, 2021**

_____ If this application is being submitted for a Second Draw PPP Loan, the Borrower used all First Draw PPP Loan amounts on eligible expenses prior to disbursement of the Second Draw PPP Loan.

_____ The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects. I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

_____ The tax documents I have submitted to the Lender (if applicable) are consistent with those the Borrower has submitted/will submit to the IRS and/or state tax or workforce agency. I also understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of ensuring compliance with PPP requirements and all SBA reviews.

_____ I understand, acknowledge, and agree that SBA may request additional information for the purposes of evaluating the Borrower's eligibility for the PPP loan and for loan forgiveness, and that the Borrower's failure to provide information requested by SBA may result in a determination that the Borrower was ineligible for the PPP loan or a denial of the Borrower's loan forgiveness application.

_____ If the Borrower has checked the box for FTE Reduction Safe Harbor 1 on PPP Schedule A, the Borrower was unable to operate between February 15, 2020 and the end of the Covered Period at the same level of business activity as before February 15, 2020 due to compliance with requirements established or guidance issued between March 1, 2020 and December 31, 2020 (or, for a PPP loan made after December 27, 2020, requirements established or guidance issued between March 1, 2020 and the last day of the Covered Period), by the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, or the Occupational Safety and Health Administration, related to the maintenance of standards of sanitation, social distancing, or any other work or customer safety requirement related to COVID-19.

The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application. SBA may direct a lender to disapprove the Borrower's loan forgiveness application if SBA determines that the Borrower was ineligible for the PPP loan.

| | |
|---|---|
| _____________________________________________ | ____________________________ |
| Signature of Authorized Representative of Borrower | Date |
| _____________________________________________ | ____________________________ |
| Print Name | Title |

## PPP Schedule A

PPP Schedule A Worksheet, Table 1 Totals

Line 1. Enter Cash Compensation (Box 1) from PPP Schedule A Worksheet, Table 1: ____________________

Line 2. Enter Average FTE (Box 2) from PPP Schedule A Worksheet, Table 1: ____________________

Line 3. Enter Salary/Hourly Wage Reduction (Box 3) from PPP Schedule A Worksheet, Table 1: ____________________
If the average annual salary or hourly wage for each employee listed on the PPP Schedule A Worksheet, Table 1 during the Covered Period was at least 75% of such employee's average annual salary or hourly wage for the most recent full quarter before the Covered Period, check here ☐ and enter **0** on line 3.

PPP Schedule A Worksheet, Table 2 Totals

Line 4. Enter Cash Compensation (Box 4) from PPP Schedule A Worksheet, Table 2: ____________________

Line 5. Enter Average FTE (Box 5) from PPP Schedule A Worksheet, Table 2: ____________________

Non-Cash Compensation Payroll Costs During the Covered Period

Line 6. Total amount paid or incurred by Borrower for employer contributions for employee insurance: ____________________

Line 7. Total amount paid or incurred by Borrower for employer contributions to employee retirement plans: ____________________

Line 8. Total amount paid or incurred by Borrower for employer state and local taxes assessed on employee compensation: ____________________

Compensation to Owners

Line 9. Total amount paid to owner-employees/self-employed individual/general partners: ____________________
This amount may not be included in PPP Schedule A Worksheet, Table 1 or 2. If there is more than one individual included, attach a separate table that lists the names of and payments to each.

Total Payroll Costs

Line 10. Payroll Costs (add lines 1, 4, 6, 7, 8, and 9): ____________________

Full-Time Equivalency (FTE) Reduction Calculation
If you satisfy **any** of the following three criteria, check the appropriate box, skip lines 11 and 12, and enter **1.0** on line 13; otherwise, complete lines 11, 12, and 13:

**No reduction in employees or average paid hours:** If you have not reduced the number of employees or the average paid hours of your employees between January 1, 2020 and the end of the Covered Period, check here ☐

**FTE Reduction Safe Harbor 1:** If you were unable to operate between February 15, 2020, and the end of the Covered Period at the same level of business activity as before February 15, 2020 due to compliance with requirements established or guidance issued between March 1, 2020 and December 31, 2020 (or, with respect to a PPP loan made on or after December 27, 2020, between March 1, 2020 and the last day of the Covered Period with respect to such loan), by the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, or the Occupational Safety and Health Administration related to the maintenance of standards for sanitation, social distancing, or any other worker or customer safety requirement related to COVID-19, check here ☐

**FTE Reduction Safe Harbor 2:** If you satisfy FTE Reduction Safe Harbor 2 (see PPP Schedule A Worksheet), check here ☐

Line 11. Average FTE during the Borrower's chosen reference period: ____________________

Line 12. Total Average FTE (add lines 2 and 5): ____________________

Line 13. FTE Reduction Quotient (divide line 12 by line 11) or enter 1.0 if any of the above criteria are met: ____________________

Case 8:23-cv-00134-JVS-ADS Document 46-2 Filed 07/30/25 Page 6 of 15 Page ID #:344

OMB Control No.: 3245-0407
Expiration Date: 01/31/2022

**Paycheck Protection Program**
**Loan Forgiveness Application Form 3508 Revised July 30, 2021**

## PPP Schedule A Worksheet

**Table 1:** List employees who:
- Were employed by the Borrower at any point during the Covered Period whose principal place of residence is in the United States; and
- Received compensation from the Borrower at an annualized rate of less than or equal to $100,000 for all pay periods in 2019 or were not employed by the Borrower at any point in 2019.

| Employee's Name | Employee Identifier | Cash Compensation | Average FTE | Salary / Hourly Wage Reduction |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **FTE Reduction Exceptions:** | | | | |
| **Totals:** | | **Box 1** | **Box 2** | **Box 3** |

**Table 2:** List employees who:
- Were employed by the Borrower at any point during the Covered Period whose principal place of residence is in the United States; and
- Received compensation from the Borrower at an annualized rate of more than $100,000 for any pay period in 2019.

| Employee's Name | Employee Identifier | Cash Compensation | Average FTE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| **Totals:** | | **Box 4** | **Box 5** |

Attach additional tables if additional rows as needed.

**FTE Reduction Safe Harbor 2:**

Step 1. Enter the borrower's total average FTE between February 15, 2020 and April 26, 2020. Follow the same method that was used to calculate Average FTE in the PPP Schedule A Worksheet Tables. Sum across all employees and enter: ______________.

Step 2. Enter the borrower's total FTE in the Borrower's pay period inclusive of February 15, 2020. Follow the same method that was used in step 1:_______________.

Step 3. If the entry for step 2 is greater than step 1, proceed to step 4. Otherwise, FTE Reduction Safe Harbor 2 is not applicable and the Borrower must complete line 13 of PPP Schedule A by dividing line 12 by line 11 of that schedule.

Step 4. Enter the borrower's total FTE (a) for a PPP loan made before December 27, 2020, as of December 31, 2020 or (b) for a PPP loan made after December 27, 2020, the last day of the covered period:______________.

Step 5. If the entry for step 4 is greater than or equal to step 2, enter 1.0 on line 13 of PPP Schedule A; the FTE Reduction Safe Harbor 2 has been satisfied. Otherwise, FTE Reduction Safe Harbor 2 does not apply and the Borrower must complete line 13 of PPP Schedule A by dividing line 12 by line 11 of that schedule.

**Paperwork Reduction Act** – You are not required to respond to this collection of information unless it displays a currently valid OMB Control Number. The estimated time for completing this application, including gathering data needed, is 180 minutes. Comments about this time or the information requested should be sent to Small Business Administration, Director, Records Management Division, 409 3rd St., SW, Washington DC 20416, and/or SBA Desk Officer, Office of Management and Budget, New Executive Office Building, Washington DC 20503. **PLEASE DO NOT SEND FORMS TO THESE ADDRESSES.**

**Paycheck Protection Program**
**Loan Forgiveness Application Form 3508 Revised July 30, 2021**

OMB Control No.: 3245-0407
Expiration Date: 01/31/2022

## LOAN FORGIVENESS APPLICATION FORM 3508 INSTRUCTIONS FOR BORROWERS

To apply for forgiveness of your First or Second Draw Paycheck Protection Program (PPP) loan, you (the Borrower) may use the Form 3508EZ or the Form 3508S application or complete this application as directed in these instructions, and **submit it to your Lender** (or the Lender that is servicing your loan). Borrowers may also complete their application electronically through their Lender. Each PPP loan must use a separate loan forgiveness application form. You cannot use one form to apply for forgiveness of both a First Draw PPP Loan and a Second Draw PPP loan. For a Second Draw PPP Loan in excess of $150,000, you must submit a loan forgiveness application for your First Draw PPP Loan before or simultaneously with the loan forgiveness application for your Second Draw PPP Loan, even if the calculated amount of forgiveness on your First Draw PPP Loan is zero.

If this application is being submitted for a First Draw PPP Loan approved on or before August 8, 2020 and the Borrower is required to submit an SBA Form 3508D disclosure of a controlling interest, that disclosure must be submitted to the lender not later than 30 days after submission of this loan forgiveness application. See subsection B.16 of SBA's interim final rule posted on January 6, 2021 (86 FR 3692).

This application has the following components: (1) the PPP Loan Forgiveness Calculation Form; (2) PPP Schedule A; (3) the PPP Schedule A Worksheet; and (4) the (optional) PPP Borrower Demographic Information Form. All Borrowers must submit (1) and (2) to their Lender.

### Instructions for PPP Loan Forgiveness Calculation Form

**Business Legal Name ("Borrower")/DBA or Tradename (if applicable)/Business TIN (EIN, SSN, ITIN):** Enter the same information as on your Borrower Application Form (SBA Form 2483, SBA Form 2483-SD, SBA Form 2483-C, SBA Form 2483-SD-C, or lender's equivalent).

**Business Address/NAICS Code/Business Phone/Primary Contact/E-mail Address:** Enter the same information as on your Borrower Application Form, unless there has been a change in address or contact information. If NAICS Code was not on the Borrower Application Form, match the business activity code provided on IRS income tax filings, if applicable.

**First Draw PPP Loan or Second Draw PPP Loan:** Select the box that describes the PPP loan that this forgiveness application is for. If you only have one PPP loan, select First Draw PPP Loan.

**SBA PPP Loan Number:** Enter the loan number assigned by SBA at the time of loan approval. Request this number from the Lender if necessary.

**Lender PPP Loan Number:** Enter the loan number assigned to the PPP loan by the Lender.

**PPP Loan Amount:** Enter the original disbursed principal amount of the PPP loan (the original loan amount you received from the Lender).

**PPP Loan Disbursement Date:** Enter the date that you received the PPP loan proceeds from the Lender. If loan proceeds were received on more than one date, enter the first date on which you received PPP loan proceeds. If you received an authorized increase on your First Draw PPP Loan after December 27, 2020, you must enter the date on which you received the original disbursement of your PPP loan proceeds.

**Amount of PPP Loan Increase:** Enter the disbursed amount of an authorized increase on your First Draw PPP Loan received after December 27, 2020 (if applicable).

**Date of PPP Loan Increase:** Enter the date that you received the proceeds of the authorized increase on your First Draw PPP Loan from the Lender (if applicable).

**Employees at Time of Loan Application:** Enter the total number of employees (including owners/partners) at the time of the PPP loan application.

**Employees at Time of Forgiveness Application:** Enter the total number of employees (including owners/partners) at the time the Borrower is applying for loan forgiveness.

**Covered Period:** The Covered Period begins on the date the loan was originally disbursed. It ends on a date selected by the Borrower that is at least 8 weeks following the date of loan disbursement and not more than 24 weeks after the date of loan disbursement. For example, if the Borrower received their PPP loan proceeds on Monday, April 20, 2020, the first day of the Covered Period is Monday, April 20, 2020 and the final day of the Covered Period is any date selected by the Borrower between

Sunday, June 14, 2020 and Sunday, October 4, 2020.

**Forgiveness Amount Calculation (see Summary of Costs Eligible for Forgiveness below):**

**Line 1:** Enter total eligible payroll costs incurred or paid during the Covered Period. To calculate these costs, complete PPP Schedule A. Enter the amount from PPP Schedule A, line 10.

**Line 2:** Enter the amount of business mortgage interest payments paid or incurred during the Covered Period for any business mortgage obligation on real or personal property incurred before February 15, 2020. Do not include prepayments.

**Line 3:** Enter the amount of business rent or lease payments paid or incurred for real or personal property during the Covered Period, pursuant to lease agreements in force before February 15, 2020.

**Line 4:** Enter the amount of business utility payments paid or incurred during the Covered Period, for business utilities for which service began before February 15, 2020.

**Line 5:** Enter the amount of covered operations expenditures paid or incurred during the Covered Period.

**Line 6:** Enter the amount of covered property damage costs paid or incurred during the Covered Period.

**Line 7:** Enter the amount of covered supplier costs paid or incurred during the Covered Period pursuant to a contract, order, or purchase order in effect prior to the beginning of the Covered Period (for perishable goods, the contract, order, or purchase order must have been in effect before or at any time during the Covered Period).

**Line 8:** Enter the amount of covered worker protection expenditures paid or incurred during the Covered Period.

*NOTE: For lines 2-8, you are not required to report payments that you do not want to include in the forgiveness amount.*

**Line 9:** Enter the number from PPP Schedule A, line 3. This amount reflects the loan forgiveness reduction required for salary/hourly wage reductions in excess of 25% for certain employees as described in PPP Schedule A.

**Line 10:** Add lines 1 through 8, subtract line 9, enter the total. If this amount is less than zero, enter a zero.

**Line 11:** Enter the number from PPP Schedule A, line 13.

**Line 12:** Enter the amount on line 10 multiplied by the amount on line 11. This calculation incorporates the loan forgiveness reduction required for any full-time equivalency (FTE) employee reductions as described in PPP Schedule A.

**Line 13:** Enter the PPP Loan Amount.

**Line 14:** Divide the amount on line 1 by 0.60, and enter the amount. This determines whether at least 60% of the potential forgiveness amount was used for payroll costs.

**Line 15:** Enter the smallest of lines 12, 13, or 14.

**Summary of Costs Eligible for Forgiveness:**

Borrowers are eligible for loan forgiveness for the following costs:

1. **Eligible payroll costs.** Borrowers are generally eligible for forgiveness for the payroll costs paid and payroll costs incurred during the Covered Period ("payroll costs"). Payroll costs are considered paid on the day that paychecks are distributed or the Borrower originates an ACH credit transaction. Payroll costs are considered incurred on the day that the employee's pay is earned. Payroll costs incurred but not paid during the Borrower's last pay period of the Covered Period are eligible for forgiveness if paid on or before the next regular payroll date. Otherwise, payroll costs must be paid during the Covered Period. For each individual employee, the total amount of cash compensation eligible for forgiveness may not exceed an annual salary of $100,000, as prorated for the Covered Period. Count payroll costs that were both paid and incurred only once. Include only payroll costs for employees whose principal place of residence is in the United States. For information on what qualifies as payroll costs, see SBA's interim final rule posted on January 6, 2021 (86 FR 3692), as amended by SBA's interim final rule posted on March 18, 2021 (86 FR 15083). For information on what qualifies as payroll costs for a Borrower that applied for the loan using SBA Form 2483-C or 2483-SD-C, see SBA's interim final rule on loan amount calculation and eligibility posted on March 3, 2021 (86 FR 13149), as amended by SBA's interim final rule posted on March 18, 2021 (86 FR 15083).

2. **Eligible nonpayroll costs.** Nonpayroll costs eligible for forgiveness consist of:
   (a) covered mortgage obligations: payments of mortgage interest (not including any prepayment or payment of principal) on any business mortgage obligation on real or personal property incurred before February 15, 2020 ("business mortgage interest payments");
   (b) covered rent obligations: business rent or lease payments pursuant to lease agreements for real or personal property in force before February 15, 2020 ("business rent or lease payments");
   (c) covered utility payments: business payments for a service for the distribution of electricity, gas, water, telephone, transportation, or internet access for which service began before February 15, 2020 ("business utility payments");
   (d) covered operations expenditures: payments for any business software or cloud computing service that facilitates business operations, product or service delivery, the processing, payment, or tracking of payroll expenses, human resources, sales and billing functions, or accounting of tracking of supplies, inventory, records, and expenses;
   (e) covered property damage costs: costs related to property damage and vandalism or looting due to public disturbances that occurred during 2020 that were not covered by insurance or other compensation;
   (f) covered supplier costs: expenditures made to a supplier of goods for the supply of goods that are essential to the operations of the Borrower at the time at which the expenditure is made, and made pursuant to a contract, order, or purchase order in effect prior to the beginning of the Covered Period (for perishable goods, the contract, order, or purchase order may have been in effect before or at any time during the Covered Period); and
   (g) covered worker protection expenditures: operating or capital expenditures that facilitate the adaptation of the business activities of an entity to comply with the requirements established or guidance issued by the Department of Health and Human Services, the Centers for Disease Control, or the Occupational Safety and Health Administration, or any equivalent requirements established or guidance issued by a State or local government, during the period starting March 1, 2020 and ending on the date on which the national emergency declared by the President with respect to the Coronavirus Disease 2019 (COVID-19) expires related to maintenance standards for sanitation, social distancing, or any other worker or customer safety requirement related to COVID-19, but does not include residential real property or intangible property.

   Eligible nonpayroll costs cannot exceed 40% of the total forgiveness amount. An eligible nonpayroll cost must be paid either during the Covered Period or incurred during the Covered Period and paid on or before the next regular billing date, even if the billing date is after the Covered Period. Count nonpayroll costs that were both paid and incurred only once.

The amount of loan forgiveness the Borrower applies for may be subject to reductions as explained in PPP Schedule A.

## Instructions for PPP Schedule A

**Lines 1 through 5:** Enter the amounts from PPP Schedule A Worksheet Tables as directed.

Enter the amount from line 3 of PPP Schedule A on line 9 of the PPP Loan Forgiveness Application Form.

**For lines 6 through 9,** during the Covered Period:

**Line 6:** Enter the total amount paid by the Borrower for employer contributions for employee group health, life, disability, vision, or dental insurance, including employer contributions to a self-insured, employer-sponsored group health plan, but excluding any pre-tax or after-tax contributions by employees. Do not add contributions for these benefits made on behalf of a self-employed individual, general partners, or owner-employees of an S-corporation, because such payments are already included in their compensation. Additionally, do not add premiums for COBRA continuation coverage taken into account in determining the credit under section 6432 of the Internal Revenue Code of 1986.

**Line 7:** Enter the total amount paid by the Borrower for employer contributions to employee retirement plans, excluding any pre-tax or after-tax contributions by employees. Do not add employer retirement contributions made on behalf of a self-employed individual or general partners, because such payments are already included in their compensation.

**Line 8:** Enter the total amount paid by the Borrower for employer state and local taxes assessed on employee compensation (e.g., state unemployment insurance tax); do not list any taxes withheld from employee earnings.

**Line 9:** Enter any amounts the Borrower paid to owners (owner-employees (with an ownership stake of 5% or more), a self-employed individual, or general partners). For each individual owner in total across all businesses, this amount is capped at (a) $20,833 (the 2.5-month equivalent of $100,000 per year), or (b) the 2.5-month equivalent of the individual's applicable compensation in the year that was used to calculate the loan amount (2019 or 2020), whichever is lower. If Borrower applied for the loan using SBA Form 2483-C or 2483-SD-C, owner compensation includes proprietor expenses (business expenses plus owner compensation). Proprietor expenses equal the difference between the Borrower's gross income and employee payroll costs. The Borrower's proprietor expenses are capped at (a) $20,833 (the 2.5-month equivalent of $100,000 per year), or (b) the 2.5-month equivalent of the borrower's gross income in the year that was used to calculate the loan amount (2019 or 2020), whichever is lower.

**Line 10:** Add lines 1, 4, 6, 7, 8, and 9. Enter this amount on line 1 on the PPP Loan Forgiveness Calculation Form.

**Line 11:** Enter the Borrower's total average weekly full-time equivalency (FTE) during the chosen reference period. For purposes of this calculation, the reference period is, at the Borrower's election, either (i) February 15, 2019 to June 30, 2019; (ii) January 1, 2020 to February 29, 2020; or (iii) in the case of seasonal employers, either of the preceding periods or any consecutive 12-week period between February 15, 2019 and February 15, 2020. For each employee, follow the same method that was used to calculate Average FTE on the PPP Schedule A Worksheet. Sum across all employees during the reference period and enter that total on this line.

The calculations on lines 11, 12, and 13 will be used to determine whether the Borrower's loan forgiveness amount must be reduced based on reductions in full-time equivalent employees, as required by the statute. Specifically, the actual loan forgiveness amount that the Borrower will receive may be reduced if the Borrower's average weekly FTE employees during the Covered Period was less than during the Borrower's chosen reference period. The Borrower is exempt from such a reduction, and should skip lines 11 and 12, if any of the three criteria listed on PPP Schedule A under Full-Time Equivalency (FTE) Reduction Calculation has been met.

**Line 12:** Add lines 2 and 5.

**Line 13:** Divide line 12 by line 11 (or enter 1.0 if any of the three criteria listed on PPP Schedule A under Full-Time Equivalency (FTE) Reduction Calculation has been met). If more than 1.0, enter 1.0. Enter this amount on line 11 of the Loan Forgiveness Calculation Form.

**Instructions for PPP Schedule A Worksheet**

Complete the PPP Schedule A Worksheet or obtain an equivalent report from the Borrower's payroll system or payroll processor.

**Table Instructions**

**Employee's Name:** Separately list each employee. Do not include any independent contractors, owner-employees (with an ownership stake of 5% or more), self-employed individuals, or partners. Include only payroll costs for employees whose principal place of residence is in the United States.

**Employee Identifier:** Enter the last four digits of each employee's Social Security Number.

**Cash Compensation:** Enter the sum of gross salary, gross wages, gross tips, gross commissions, paid leave (vacation, family, medical or sick leave, not including leave covered by the Families First Coronavirus Response Act), and allowances for dismissal or separation paid or incurred during the Covered Period. Do not include qualified wages taken into account in determining (a) the Employee Retention Credit under section 2301 of the CARES Act, as amended by sections 206 and 207 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020; (b) the Employee Retention Credit under section 3134 of the Internal Revenue Code of 1986, as enacted by the American Rescue Plan Act of 2021; and (c) the disaster credit under section 303 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020. For each individual employee, the total amount of cash compensation eligible for forgiveness may not exceed an annual salary of $100,000, as prorated for the Covered Period. For example, for an 8-week Covered Period, the maximum is $15,385, for a 24-week Covered Period, the maximum is $46,154.

**Average FTE:** This calculates the average full-time equivalency (FTE) during the Covered Period. For each employee, enter the average number of hours paid per week, divide by 40, and round the total to the nearest tenth. The maximum for each employee is capped at 1.0. A simplified method that assigns a 1.0 for employees who work 40 hours or more per week and 0.5 for employees who work fewer hours may be used at the election of the Borrower.

This calculation will be used to determine whether the Borrower's loan forgiveness amount must be reduced due to a statutory requirement concerning reductions in full-time equivalent employees. Borrowers are eligible for loan forgiveness for certain expenditures during the Covered Period. However, the actual loan forgiveness amount that the Borrower will receive may be less, depending on whether the Borrower's average weekly number of FTE employees during the Covered Period was less than during the Borrower's chosen reference period (*see* Instructions to PPP Schedule A, Line 11). The Borrower is exempt from such a reduction if either of the FTE Reduction Safe Harbors applies. See the FTE Reduction Safe Harbor instructions below.

**Salary/Hourly Wage Reduction:** This calculation will be used to determine whether the Borrower's loan forgiveness amount must be reduced due to a statutory requirement concerning reductions in employee salary and wages. Borrowers are eligible for loan forgiveness for certain expenditures during the Covered Period. However, the actual amount of loan forgiveness the Borrower will receive may be less, depending on whether the salary or hourly wages of certain employees during the Covered Period was less than during the most recent full quarter before the Covered Period. If the Borrower restored salary/hourly wage levels, the Borrower may be eligible for elimination of the Salary/Hourly Wage Reduction amount. Borrowers must complete this worksheet to determine whether to reduce the amount of loan forgiveness for which they are eligible. Complete the Salary/Hour Wage Reduction column only for employees whose salaries or hourly wages were reduced by more than 25% during the Covered Period as compared to the most recent full quarter before the Covered Period. For each employee listed in Table 1, complete the following (using salary for salaried employees and hourly wage for hourly employees):

Step 1. Determine if pay was reduced more than 25%.

a. Enter average annual salary or hourly wage during Covered Period: _____________.
b. Enter average annual salary or hourly wage during the most recent full quarter before the Covered Period:___.
c. Divide the value entered in 1.a. by 1.b.: _______________.
   If 1.c. is 0.75 or more, enter zero in the column above box 3 for that employee; otherwise proceed to Step 2.

Step 2. Determine if the Salary/Hourly Wage Reduction Safe Harbor is met.

a. Enter the annual salary or hourly wage as of February 15, 2020:_______________.
b. Enter the average annual salary or hourly wage between February 15, 2020 and April 26, 2020: _______________.
   If 2.b. is equal to or greater than 2.a., skip to Step 3. Otherwise, proceed to 2.c.
c. Enter the average annual salary or hourly wage as of (a) for a PPP loan made before December 27, 2020, December 31, 2020 or (b) for a PPP loan made after December 27, 2020, the last day of the Covered Period: _________________.
   If 2.c. is equal to or greater than 2.a., the Salary/Hourly Wage Reduction Safe Harbor has been met – enter zero in the column above box 3 for that employee. Otherwise proceed to Step 3.

Step 3. Determine the Salary/Hourly Wage Reduction.

a. Multiply the amount entered in 1.b. by 0.75: ________________.

b. Subtract the amount entered in 1.a. from 3.a.:________________.

If the employee is an hourly worker, compute the total dollar amount of the reduction that exceeds 25% as follows:

c. Enter the average number of hours worked per week during the most recent full quarter before the Covered Period: ______________.

d. Multiply the amount entered in 3.b. by the amount entered in 3.c.______________. Multiply this amount by the number of weeks in the Covered Period (a whole number between 8 and 24):______________. Enter this value in the column above box 3 for that employee.

If the employee is a salaried worker, compute the total dollar amount of the reduction that exceeds 25% as follows:

e. Multiply the amount entered in 3.b. by the number of weeks in the Covered Period:__________________. Divide this amount by 52:__________________________.Enter this value in the column above box 3 for that employee.

**FTE Reduction Exceptions:** Indicate the FTE of (1) any positions for which the Borrower made a good-faith, written offer to rehire an individual who was an employee on February 15, 2020 and the Borrower was unable to hire similarly qualified employees for unfilled positions on or before (a) December 31, 2020, for a PPP loan made before December 27, 2020 or (b) the last day of the Covered Period, for a PPP loan made after December 27, 2020; (2) any positions for which the Borrower made a good-faith, written offer to restore any reduction in hours, at the same salary or wages, during the Covered Period and the employee rejected the offer, and (3) any employees who during the Covered Period (a) were fired for cause, (b) voluntarily resigned, or (c) voluntarily requested and received a reduction of their hours. In all of these cases, include these FTEs on this line only if the position was not filled by a new employee. Any FTE reductions in these cases do not reduce the Borrower's loan forgiveness.

**Boxes 1 through 5:** Enter the sums of the amounts in each of the columns.

**FTE Reduction Safe Harbors**

Two separate safe harbors exempt certain borrowers from any loan forgiveness reduction based on a reduction in FTE employee levels:

1. The Borrower is exempt from the reduction in loan forgiveness based on a reduction in FTE employees described above if the Borrower, in good faith, is able to document that it was unable to operate between February 15, 2020, and the end of the Covered Period at the same level of business activity as before February 15, 2020, due to compliance with requirements established or guidance issued between March 1, 2020 and December 31, 2020 (or, for a PPP loan made after December 27, 2020, requirements established or guidance issued between March 1, 2020 and the last day of the Covered Period), by the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, or the Occupational Safety and Health Administration, related to the maintenance of standards for sanitation, social distancing, or any other worker or customer safety requirement related to COVID-19.

2. The Borrower is exempt from the reduction in loan forgiveness based on a reduction in FTE employees described above if both of the following conditions are met: (a) the Borrower reduced its FTE employee levels in the period beginning February 15, 2020, and ending April 26, 2020; and (b) the Borrower then restored its FTE employee levels to its FTE employee levels in the Borrower's pay period that included February 15, 2020 by not later than (i) December 31, 2020, for a PPP loan made before December 27, 2020, or (ii) the last day of the Covered Period, for a PPP loan made after December 27, 2020.

**Documents that Each Borrower Must Submit with its PPP Loan Forgiveness Application**

**PPP Loan Forgiveness Calculation Form**

**PPP Schedule A**

**Payroll:** Documentation verifying the eligible cash compensation and non-cash benefit payments from the Covered Period consisting of each of the following:

a. Bank account statements or third-party payroll service provider reports documenting the amount of cash compensation paid to employees.
b. Tax forms (or equivalent third-party payroll service provider reports) for the periods that overlap with the Covered Period:
   i. Payroll tax filings reported, or that will be reported, to the IRS (typically, Form 941); and
   ii. State quarterly business and individual employee wage reporting and unemployment insurance tax filings reported, or that will be reported, to the relevant state.
c. Payment receipts, cancelled checks, or account statements documenting the amount of any employer contributions to employee group health, life, disability, vision or dental insurance and retirement plans that the Borrower included in the forgiveness amount (PPP Schedule A, lines (6) and (7)).

**FTE:** Documentation showing (at the election of the Borrower):

a. the average number of FTE employees on payroll per week employed by the Borrower between February 15, 2019 and June 30, 2019;
b. the average number of FTE employees on payroll per week employed by the Borrower between January 1, 2020 and February 29, 2020; or
c. in the case of a seasonal employer, the average number of FTE employees on payroll per week employed by the Borrower between February 15, 2019 and June 30, 2019; between January 1, 2020 and February 29, 2020; or any consecutive 12-week period between February 15, 2019 and February 15, 2020.

The selected time period must be the same time period selected for purposes of completing PPP Schedule A, line 11. Documents may include payroll tax filings reported, or that will be reported, to the IRS (typically, Form 941) and state quarterly business and individual employee wage reporting and unemployment insurance tax filings reported, or that will be reported, to the relevant state. Documents submitted may cover periods longer than the specific time period.

**Nonpayroll:** For categories a-c, documentation verifying existence of the obligations/services prior to February 15, 2020 and, for all categories, eligible payments from the Covered Period.

a. Business mortgage interest payments: Copy of lender amortization schedule and receipts or cancelled checks verifying eligible payments from the Covered Period; or lender account statements from February 2020 and the months of the Covered Period through one month after the end of the Covered Period verifying interest amounts and eligible payments.
b. Business rent or lease payments: Copy of current lease agreement and receipts or cancelled checks verifying eligible payments from the Covered Period; or lessor account statements from February 2020 and from the Covered Period through one month after the end of the Covered Period verifying eligible payments.
c. Business utility payments: Copy of invoices from February 2020 and those paid during the Covered Period and receipts, cancelled checks, or account statements verifying those eligible payments.
d. Covered operations expenditures: Copy of invoices, orders, or purchase orders paid during the Covered Period and receipts, cancelled checks, or account statements verifying those eligible payments.
e. Covered property damage costs: Copy of invoices, orders, or purchase orders paid during the Covered Period and receipts, cancelled checks, or account statements verifying those eligible payments, and documentation that the costs were related to property damage and vandalism or looting due to public disturbances that occurred during 2020 and such costs were not covered by insurance or other compensation.
f. Covered supplier costs: Copy of contracts, orders, or purchase orders in effect at any time before the Covered Period (except for perishable goods), copy of invoices, orders, or purchase orders paid during the Covered Period and receipts, cancelled checks, or account statements verifying those eligible payments.
g. Covered worker protection expenditures: Copy of invoices, orders, or purchase orders paid during the Covered Period and receipts, cancelled checks, or account statements verifying those eligible payments, and documentation that the expenditures were used by the Borrower to comply with applicable COVID-19 guidance during the Covered Period.

**Documents that Each Borrower Must Maintain but is Not Required to Submit**

PPP Schedule A Worksheet or its equivalent and the following:

a. Documentation supporting the listing of each individual employee in PPP Schedule A Worksheet Table 1, including the "Salary/Hourly Wage Reduction" calculation, if necessary.
b. Documentation supporting the listing of each individual employee in PPP Schedule A Worksheet Table 2; specifically, that

each listed employee received during any single pay period in 2019 compensation at an annualized rate of more than $100,000.

c. Documentation regarding any employee job offers and refusals, refusals to accept restoration of reductions in hours, firings for cause, voluntary resignations, written requests by any employee for reductions in work schedule, and any inability to hire similarly qualified employees for unfilled positions on or before (i) December 31, 2020 for a PPP loan made before December 27, 2020 or (ii) the last day of the Covered Period for a PPP loan made after December 27, 2020.

d. Documentation supporting the certification, if applicable, that the Borrower was unable to operate between February 15, 2020, and the end of the Covered Period at the same level of business activity as before February 15, 2020 due to compliance with requirements established or guidance issued between March 1, 2020 and December 31, 2020 (or, for a PPP loan made after December 27, 2020, requirements established or guidance issued between March 1, 2020 and the last day of the Covered Period) by the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, or the Occupational Safety and Health Administration, related to the maintenance of standards of sanitation, social distancing, or any other work or customer safety requirement related to COVID-19. This documentation must include copies of the applicable requirements for each borrower location and relevant borrower financial records.

e. Documentation supporting the PPP Schedule A Worksheet “FTE Reduction Safe Harbor 2.

All records relating to the Borrower’s PPP loan, including documentation submitted with its PPP loan application, documentation supporting the Borrower’s certifications as to the necessity of the loan request and its eligibility for a PPP loan (including the Borrower’s gross receipt reduction certification for a Second Draw PPP Loan, if applicable), documentation necessary to support the Borrower’s loan forgiveness application, and documentation demonstrating the Borrower’s material compliance with PPP requirements.

**Records Retention Requirement:** The Borrower must retain all such documentation in its files for six years after the date the loan is forgiven or repaid in full, and permit authorized representatives of SBA, including representatives of its Office of Inspector General, to access such files upon request. The Borrower must provide documentation independently to a lender to satisfy relevant Federal, State, local or other statutory or regulatory requirements or in connection with an SBA loan review or audit.